Argued and submitted November 6, 2006, sentence of death affirmed
December 20, 2007, reconsideration denied March 26, 2008

# STATE OF OREGON,
*Plaintiff,*

*v.*

# MICHAEL MARTIN McDONNELL,
*Defendant.*

### (CC J850004; SC S49368)

176 P3d 1236

Rankin Johnson, Deputy Public Defender, Salem, argued the cause for defendant. Dan Maloney, Senior Deputy Public Defender, filed the brief for defendant. With him on the brief were Peter A. Ozanne, Executive Director, and Peter Gartlan, Chief Defender, Office of Public Defense Services.

Kathleen Cegla, Assistant Attorney General, Salem, argued the cause and filed the briefs for plaintiff. With her on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Jennifer S. Lloyd, Assistant Attorney General.

Before De Muniz, Chief Justice, and Carson, Gillette, Durham, and Balmer, Justices.*

DURHAM, J.

---

\* Carson, J., retired December 31, 2006, and did not participate in the decision of this case. Kistler, Walters, and Linder, JJ., did not participate in the consideration or decision of this case.

## DURHAM, J.

Defendant appeals from a 2002 judgment imposing a sentence of death upon remand from this court. Defendant previously was convicted for aggravated murder. That judgment is subject to automatic and direct review in this court. ORS 138.012(1). For the reasons that follow, we affirm defendant's sentence of death.

We start with a brief outline of the procedural history of this case. In 1988, trial commenced in Douglas County Circuit Court on a charge that defendant had committed aggravated murder in killing Joey Keever. A jury found defendant guilty of aggravated murder and imposed a death sentence.[1] According to the record, the district attorney had informed defendant prior to trial that he was willing to enter into a plea agreement that effectively would have eliminated the possibility of a death sentence, but the district attorney would do so only if the victim's parents also agreed. Defendant was amenable to the district attorney's proposal, but the victim's parents were not. The district attorney chose to decline further plea negotiations and proceeded to trial, where, as noted, the jury sentenced defendant to death. On direct review in 1990, the state conceded that the district attorney, in violation of the statutes that authorized him to engage in plea negotiations, had impermissibly delegated the decision to enter into a plea agreement to the victim's parents. This court agreed, vacated the judgment, and remanded the case to the trial court for further proceedings. *State v. McDonnell*, 310 Or 98, 104-07, 794 P2d 780 (1990). On remand, defendant again was convicted of aggravated murder and sentenced to death. On direct review in 1992, this court affirmed defendant's conviction of aggravated murder, but vacated the sentence of death because, as the state conceded, the trial court had refused to give a required mitigating evidence jury instruction during the penalty-phase proceeding. *State v. McDonnell*, 313 Or 478, 506, 837 P2d 941 (1992). On remand, after another penalty-phase proceeding, the jury returned a verdict of death. On direct review in 1999,

---

[1] *State v. McDonnell*, 313 Or 478, 480-82, 837 P2d 941 (1992), sets out the facts that led to defendant's conviction.

this court again vacated the sentence of death because the trial court had not allowed the jury to consider the option of sentencing defendant to life in prison without the possibility of parole under ORS 163.150(5)(a) (1993). *State v. McDonnell*, 329 Or 375, 392, 987 P2d 486 (1999). In 2002, following another penalty-phase proceeding that commenced in 2000, the jury again imposed a sentence of death. That penalty-phase proceeding is the subject of this automatic and direct review.[2]

Defendant asserts more than 50 assignments of error on direct review. This opinion discusses only the following issues: (1) the participation of Judge Millikan in the 2002 penalty-phase proceeding; (2) defendant's right to a speedy trial; (3) the admission of transcripts of prior testimony; and (4) the admission of certain rebuttal testimony given by the state's expert, Dr. Suckow.[3]

*1.  Participation of Judge Millikan*

The first issue that we address has its origins in defendant's initial trial in 1988. Prior to that trial, defendant filed a motion under ORS 14.250 and ORS 14.260(1), which we quote below, to disqualify the Honorable Robert C. Millikan from presiding over that criminal proceeding.[4] In the affidavit required by ORS 14.260, defendant declared that he believed in good faith that Judge Millikan was prejudiced against his interests because Judge Millikan formerly had worked with the deputy district attorney prosecuting defendant's case. Defendant also stated that he had "been informed of other facts and circumstances which concern[ed] him] greatly," but did not elaborate on those other facts and circumstances. Another judge, the Honorable Joan G. Seitz, granted defendant's motion on August 25, 1987. Her order stated:

---

[2] In this opinion, we refer to the penalty-phase proceeding at issue as the "2002 penalty-phase proceeding." That is when the jury returned a sentence of death. The proceeding commenced in 2000.

[3] This court has reviewed and rejected the assignments of error that are not discussed in this opinion.

[4] At the time, Judge Millikan was a judge of the District Court for Douglas County. He later became a circuit court judge.

"THIS MATTER having come before the Court upon the motion of the defendant for the assignment of a trial judge other than the Honorable Robert C. Millikan to the trial of this matter; and sufficient cause having been shown for the allowance of the motion;

"IT IS, THEREFORE, ORDERED that a judge other than the Honorable Robert C. Millikan shall rule on all pre-trial matters and trial matters in this case."

In 2000, the circuit court began to administer the penalty-phase proceeding that this court had ordered on direct review in 1999. After two other judges recused themselves, Judge Millikan received the assignment to preside over the penalty-phase trial. The record does not explain how Judge Millikan received that assignment. Neither party objected to Judge Millikan's participation in the 2002 penalty-phase proceeding.[5] As noted, Judge Millikan presided over the proceeding and, as a consequence of the jury's verdict, entered judgment imposing a sentence of death.

On direct review, however, defendant asserts that, when Judge Seitz's order disqualified Judge Millikan from further participation in the case in 1987, Judge Millikan had no authority to act prospectively in any judicial capacity in this case. Because Judge Millikan had no authority to act in this case, defendant argues, the resulting judgment imposing the death sentence is void. Defendant also asserts that the disqualification ruling became the law of the case and that no rule required him to raise that issue a second time to preserve the legal issue for appellate review.

The state offers several arguments in response. The state contends that it is not clear whether Judge Seitz's order disqualified Judge Millikan from presiding over defendant's 2002 penalty-phase proceeding. The state also asserts that, even if Judge Millikan was disqualified pursuant to the statute, the resulting judgment is not void *per se*, but instead is only voidable. A voidable act, the state asserts, *may be* invalidated by a reviewing court if the affected party properly objected at trial and properly raised the issue on appeal; in

---

[5] At that 2002 penalty-phase proceeding, a different prosecutor represented the state. Defendant also was represented by different lawyers in the 1988 and 2002 death penalty proceedings.

this case, defendant failed to object at trial. Additionally, the state argues that defendant's guilt-phase trial in 1988 and his penalty-phase trial 15 years later in 2002 were not the same "proceeding" within the meaning of ORS 14.250 and ORS 14.260 and, therefore, defendant was obligated to object to Judge Millikan's participation in the 2002 penalty-phase proceeding. Finally, the state contends that even if Judge Millikan's conduct in presiding over the 2002 penalty-phase proceeding was error, it was not plain error and, if it was plain error, the court should not exercise its discretion to review it.

Before turning to the meaning of the disqualification statutes, we first discuss the difference between a "void" judgment and a "voidable" judgment. Those are familiar legal concepts although the disqualification statutes do not refer to them. *Black's Law Dictionary* 861 (8th ed 2004) defines a void judgment as

> "[a] judgment that has no legal force or effect, the invalidity of which may be asserted by any party whose rights are affected at any time and any place, whether directly or collaterally. From its inception, a void judgment continues to be absolutely null. It is incapable of being confirmed, ratified, or enforced in any manner or to any degree. One source of a void judgment is the lack of subject-matter jurisdiction."

In contrast, a voidable judgment is

> "[a] judgment that, although seemingly valid, is defective in some material way; esp., a judgment that, although rendered by a court having jurisdiction, is irregular or erroneous."

*Id.* This court has stated that "[t]he distinction between void and voidable is often related to the distinction between direct and collateral attack, in that it is said that a *void* judgment is subject to collateral attack, while a *voidable* judgment is subject only to direct attack." *Ketcham v. Selles*, 304 Or 529, 534, 748 P2d 67 (1987) (emphases added; citation omitted). For example, a procedural error results in a voidable judgment, while a jurisdictional error results in a void judgment. *Id.* Generally, a party must object at trial to procedural errors

that the party requests be corrected on appeal, while jurisdictional errors are vulnerable to attack on appeal without an objection at trial. *Id.* Additionally, when a trial court has both subject-matter and personal jurisdiction, a judgment issued in excess of the court's authority is voidable, not void. *See State ex rel Mix v. Newland,* 277 Or 191, 199 n 5, 560 P2d 255 (1977) (stating that where court's decree was in excess of its authority, that decree is "not void but merely voidable," so long as court had jurisdiction).

The distinction between a "void" and a "voidable" judgment takes on particular legal significance here. If, as defendant asserts, the judgment under review is void due to Judge Millikan's participation in the 2002 penalty-phase proceeding, he may attack the judgment notwithstanding his failure to object in 2002 to Judge Millikan's participation. On the other hand, if Judge Millikan's participation in the 2002 penalty-phase proceeding is a legal error that renders the resulting judgment only voidable, then defendant's failure to raise that legal error during the 2002 penalty-phase proceeding may preclude appellate review of the issue and, most important from the state's viewpoint, safeguard the judgment from reversal on that ground.

■ ■ We begin with the text of ORS 14.250 and ORS 14.260, the statutes that address the standards and procedures for disqualifying a judge from participating in a case. *See generally PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-12, 859 P2d 1143 (1993) (providing analytical framework for interpreting statutes). In construing the text of those statutes, we also examine their context, including this court's prior case law. *Wal-Mart Stores, Inc. v. City of Central Point,* 341 Or 393, 397, 144 P3d 914 (2006) (prior case law interpreting statute considered in first step of analysis).

ORS 14.250 provides:

"No judge of a circuit court shall sit to hear or try any suit, action, matter or proceeding *when it is established,* as provided in ORS 14.250 to 14.270, *that any party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge.* In such case

the presiding judge for the judicial district[6] shall forthwith transfer the cause, matter or proceeding to another judge of the court, or apply to the Chief Justice of the Supreme Court to send a judge to try it; or, if the convenience of witnesses or the ends of justice will not be interfered with by such course, and the action or suit is of such a character that a change of venue thereof may be ordered, the presiding judge may send the case for trial to the most convenient court; except that the issues in such cause may, upon the written stipulation of the attorneys in the cause agreeing thereto, be made up in the district of the judge to whom the cause has been assigned."

(Emphases added.)

ORS 14.260 provides, in part:

"(1) Any party to or any attorney appearing in any cause, matter or proceeding in a circuit court may establish the belief described in ORS 14.250 by motion supported by *affidavit that such party or attorney believes that such party or attorney cannot have a fair and impartial trial or hearing before such judge*, and that it is made in good faith and not for the purpose of delay. *No specific grounds for the belief need be alleged.* Such motion shall be allowed unless the judge moved against, or the presiding judge for the judicial district,[7] challenges the good faith of the affiant and sets forth the basis of such challenge. In the event of such challenge, a hearing shall be held before a disinterested judge. The burden of proof shall be on the challenging judge to establish that the motion was made in bad faith or for the purposes of delay.

"(2) The affidavit shall be filed with such motion at any time prior to final determination of such cause, matter or proceedings in uncontested cases, and in contested cases before or within five days after such cause, matter or proceeding is at issue upon a question of fact or within 10 days

---

[6] Defendant submitted his motion to disqualify Judge Millikan under ORS 14.250 in 1987. Since 1987, the legislature has amended ORS 14.250 to add the text "for the judicial district." Or Laws 1995, ch 781, § 28. That amendment does not affect our decision in this case.

[7] In 1995, the legislature amended ORS 14.260(1) by deleting the phrase "in those counties where there is one" and adding "for the judicial district." Or Laws 1995, ch 781, § 29. That amendment does not affect our decision in this case.

after the assignment, appointment and qualification or election and assumption of office of another judge to preside over such cause, matter or proceeding."

(Emphases added.)

It is undisputed that defendant complied with all requirements in ORS 14.260 to effect the disqualification of Judge Millikan in 1987. ORS 14.250, therefore, prohibited Judge Millikan from "sit[ting] to hear or try any suit, action, matter or proceeding." As noted, the state argues that it is not clear that the 2002 penalty-phase proceeding meets that description. The state further asserts that the 1987 order, which prohibited Judge Millikan from ruling on "all pretrial matters and trial matters in this case[,]" is unclear about whether it prohibits Judge Millikan from presiding over a penalty-phase proceeding on remand.

Neither the statute nor the court order are ambiguous in the ways that the state asserts. This court has observed that Oregon statutes divide aggravated murder trials into two phases: the guilt phase and the penalty phase. *State v. Pratt*, 309 Or 205, 210, 785 P2d 350 (1990); *State v. Pinnell*, 319 Or 438, 443 n 3, 877 P2d 635 (1994) (both so holding). A penalty-phase proceeding "is merely a continuation of the [guilt-phase] trial and not a separate or collateral proceeding threatening a new or different sanction." *State v. Montez*, 309 Or 564, 604, 789 P2d 1352 (1990). When this court reverses a judgment due to a legal error and requires a new penalty-phase proceeding, the resulting proceeding on remand, according to the reasoning in *Montez*, is a further continuation of the two-phase trial process, not a separate or collateral proceeding. The statutory phrase "any suit, action, matter or proceeding" in ORS 14.250 embraces a penalty-phase trial on remand, because the proceeding on remand is part of the overall aggravated murder trial, not a separate proceeding. For similar reasons, the phrase "all pretrial matters and trial matters" in the court's order embraces a penalty-phase proceeding on remand. Thus, we agree with defendant that Judge Millikan acted in violation of ORS 14.250 and the 1987 court order when he presided over defendant's penalty-phase proceeding.

■ We next must consider the effect of that violation. As noted, defendant argues that the resulting judgment is void. The state asserts, to the contrary, that Judge Millikan's noncompliance with the statute is merely a procedural error that defendant waived by failing to object when Judge Millikan presided over his 2002 penalty-phase proceeding. In that connection, it is especially important to our interpretive task to note that the disqualification statutes do not address the consequences of a party's failure to object if the disqualified judge, in contravention of the prohibition set forth in ORS 14.250, commences or continues to preside over the proceeding. Defendant asserts that, notwithstanding that feature of the statutes, this court's cases dictate the result that he advocates. We turn, then, to those cases.

In *Western Athletic Club v. Thompson*, 169 Or 514, 517, 129 P2d 828 (1942), this court stated, without analysis, that "[a] decree entered by a judge, who has been disqualified in the manner described in [a predecessor statute to ORS 14.250 to 14.270] is void * * *." The sole issue in that case was whether the motion to disqualify was timely under the applicable statute. *Id.* at 515. The court concluded that the defendant had timely submitted his motion and had complied with the procedural requirements to disqualify the judge appointed to his case. *Id.* at 516. The court vacated the decree because, as noted, it deemed the decree to be "void." *Id.* at 517.

This court relied on *Western Athletic Club* approximately 25 years later in a case that challenged the denial of a disqualification motion. *Kepl v. Manzanita Corporation*, 246 Or 170, 178, 424 P2d 674 (1967). In *Kepl*, as in *Western Athletic Club*, the primary controversy concerned the timeliness of the disqualification motion. *Id.* at 176. Additionally, as in *Western Athletic Club*, the statute in *Kepl* required that the moving party establish that a judge is prejudiced against that party or that party's attorney. *See* ORS 14.250 (1965) (so requiring). Finally, as in *Western Athletic Club*, the court in *Kepl* did not engage in any analysis of whether the resulting judgment was void rather than voidable. *See also Creel v. Shadley*, 266 Or 494, 497, 513 P2d 755 (1973) (stating that

"when a judge has been disqualified he is without authority to act further in any judicial capacity in the case," but not analyzing whether an act by a disqualified judge is void or voidable).

■ ■ Our focus here is on the statements in the cases reviewed above regarding the "void" nature of a judgment entered by a disqualified judge. We must determine whether those statements are binding on this court under the principle of *stare decisis*.

This court has recently explained that "[a] decent respect for the principle of *stare decisis* dictates that this court should assume that its fully considered prior cases are correctly decided." *State v. Ciancanelli*, 339 Or 282, 290, 121 P3d 613 (2005). However, "the doctrine of stare decisis contemplates only such points as are actually involved and determined in a case[.]" *Safeway Stores v. State Bd. Agriculture*, 198 Or 43, 79-80, 255 P2d 564 (1953) (citation and quotation marks omitted). Here, although this court stated in *Western Athletic Club, Kepl*, and *Creel* that a decree issued by a disqualified judge is void, we cannot conclude that those cases "fully considered" whether the effect of a violation of the disqualification statute renders the resulting judgment void or merely voidable. Those cases included no analysis of that issue. We conclude from our review of those cases that the precise issue here actually was not involved in and determined by those prior cases. The statements in our cases on which defendant relies, therefore, are not entitled to deference under the doctrine of *stare decisis*.

Nothing in ORS 14.250 or ORS 14.260 declares that a judgment issued by a judge disqualified under those statutes is void. Moreover, those statutes do not address, let alone control, a court's jurisdiction over the subject matter or the parties in a pending case. As this court explained regarding an earlier version of the disqualification statutes, "It is to be borne in mind that this law does not oust courts of their jurisdiction, but simply requires that another judge be called to preside in the same court. There is a well-marked distinction between a judge and a court." *U'Ren v. Bagley*, 118 Or 77, 84, 245 P 1074 (1926). Neither the text nor the context of the disqualification statutes establishes that the legislature

viewed a trial judge's violation of a disqualification order as an error that would deprive the trial court of its jurisdiction to enter a judgment. We therefore agree with the state that Judge Millikan's conduct in presiding over defendant's penalty-phase trial was a procedural error to which defendant was required to object in order to preserve the issue for appellate review.

Our conclusion is bolstered by this court's reasoning in cases concerning the acts of "de facto judges." In *State ex rel Madden v. Crawford*, 207 Or 76, 89-90, 295 P2d 174 (1956), a *quo warranto* proceeding, this court held unconstitutional a statute giving authority to the Supreme Court to appoint temporary members of the court. The defendant was a circuit court judge who had been appointed pursuant to the unconstitutional statute and had acted as a member of the Supreme Court. *Id.* at 78. As to the validity of acts performed by the defendant as a member of the Supreme Court, this court explained:

> "Having been appointed to sit as a member of this court pursuant to the provisions of [the statute at issue], defendant has become a de facto judge thereof; he acts under color of authority. Acts performed by him in that capacity are not invalid. A judge de facto is, to all intents and purposes, a judge de jure as to all persons except the state, and continues as such until he is properly ousted from office. He is not a usurper. His acts or his right to act, as a de facto judge, cannot be collaterally attacked."

*Id.* at 89-90. Instead, the court explained, a *de facto* judge's acts can only be directly attacked. *Id.* at 90.

In *State v. Holman*, 73 Or 18, 27, 144 P 429 (1914), this court similarly concluded that judgments rendered by a *de facto* judge were valid unless the judge's "authority in such matters was duly challenged before any determination was reached therein." This court's reasoning in *Holman* has particular application to this case:

> "A party cannot be permitted to wait until an adverse judgment or decree is rendered against him and then claim that the judge before whom his cause was tried was powerless to

determine the issues involved. It is to be expected that when the authority of a judge is thus challenged the objection will be overruled and jurisdiction asserted and maintained. A foundation will thus be laid, however, whereby the action of the court in such particular can be reviewed on appeal."

*Id. See also Anderson ex rel Poe v. Gladden*, 205 Or 538, 288 P2d 823 (1955) (affirming dismissal of a habeas proceeding where criminal defendant failed to object to the qualifications of the trial judge to preside at trial).

Other jurisdictions also have concluded that a judgment issued by a disqualified judge is voidable and not void. For example, in *Wilson v. State*, 521 NE2d 363, 365 (Ind Ct App 1988), a judge who had disqualified himself earlier in the case reappeared following trial and granted the state's motion to correct errors. On appeal, the defendant challenged that order on the basis of the judge's disqualification. *Id.* The court rejected defendant's challenge, noting that "the rulings a disqualified judge makes are not void *per se*, but simply voidable. The disqualification of a trial judge must be seasonably raised." *Id.* at 365. Because the defendant was aware of the disqualification of the judge but failed to object, the court concluded that the defendant had waived the disqualification. *Id. See also Swinehart v. State*, 268 Ind 460, 463-64, 376 NE2d 486 (1978) (rejecting argument that a previously disqualified judge who reappeared in the defendant's case was without "jurisdiction," because defendant failed to object to the authority of that judge and therefore waived the disqualification); *City of Biloxi v. Cawley*, 332 So 2d 749, 749-50 (Miss 1976) (describing prior case's holding that disqualification may be waived by consent of the parties and that the judgment issued by a disqualified judge is voidable, not void *per se*).

It appears from the foregoing that an order disqualifying a judge under ORS 14.250 effects a procedural requirement that the disqualified judge must observe. That is the consequence of the directive in that statute that "[n]o judge of a circuit court shall sit to hear or try any suit, action, matter or proceeding" when a party or attorney has successfully moved to disqualify the judge. ORS 14.250. The disqualification order also serves as the predicate for the mandatory

transfer of the case by the presiding judge to another judge or for an application to the Chief Justice for a different trial judge. *See* ORS 14.250 (describing procedure). Although the statute expresses those procedural requirements in unmistakable terms, we do not discern from those terms or the relevant statutory context any legislative intent to treat the continued participation of a disqualified judge as an error of jurisdictional magnitude.

■     As is true with regard to a host of procedural requirements governing trials in Oregon courts, a violation of the required procedure regarding judicial disqualification furnishes an occasion for an objection by a party and, if appropriate, appellate review of the denial of the objection. Judge Millikan's participation in the proceeding below, as noted, did violate the command of ORS 14.250 that he "shall [not] sit" after disqualification. However, the reviewability of that procedural error on appeal depends on the appealing party's compliance with principles of preservation of error that govern appeals concerning virtually any procedural error occurring during trial. Central to the preservation of error is the necessity of a timely objection to the error at trial or some valid reason for excusing that requirement. The record in this case discloses no basis for excusing defendant from the requirement of a timely objection to the participation of Judge Millikan in the 2002 penalty-phase proceeding.

■     We conclude that a judgment or order issued by a disqualified judge is not void *per se*, but instead is voidable due to the trial judge's procedural error. Defendant was required to raise at the 2002 penalty-phase proceeding the issue of Judge Millikan's disqualification to obtain appellate review of that issue. Because defendant failed to object when Judge Millikan presided over the 2002 penalty-phase proceeding, defendant did not preserve that issue for appellate review.

■     Nevertheless, this court, in its discretion, may consider errors assigned on appeal that are apparent on the face of the record. ORAP 5.45(1). Generally, an error is "apparent"

when three conditions are met: (1) the error is one of law; (2) the error is not reasonably in dispute; and (3) the error appears on the face of the record such that the court need not choose between competing inferences to find it. *State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990).

■ We decline to consider the error in this case under ORAP 5.45(1) because the record is subject to competing inferences regarding defendant's failure to object to Judge Millikan's participation in his 2002 penalty-phase trial. *See State v. Gornick*, 340 Or 160, 169-70, 130 P3d 780 (2006) (declining to review claimed error because multiple competing inferences could be drawn from record). For example, defendant may have decided that he preferred Judge Millikan to the other available circuit judges or that he no longer wished to disqualify him. We decline to exercise our discretion to review the merits of defendant's unpreserved claim of error.

## 2. Right to a Speedy Trial

■ Defendant filed a motion to dismiss asserting that the delay between his arrest and his last penalty-phase trial violated his right to a speedy trial under Article I, section 10, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The trial court denied defendant's motion. Defendant renews that claim of error on direct review.

Article I, section 10, of the Oregon Constitution provides, in part, that "justice shall be administered * * * without delay * * *." The Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial[.]" US Const, Amend VI. We have interpreted the right to justice "without delay" in the state constitution to mean the same thing as the right to a speedy trial. *State v. Dodson*, 226 Or 458, 465, 360 P2d 782 (1961).

The right to a speedy trial attached in this case when the grand jury indicted defendant in 1984 for aggravated murder. *See State v. Vasquez*, 336 Or 598, 612-13, 88 P3d 271

(2004) (stating that speedy trial rights attach at indictment). Defendant's first trial resulted in a sentence of death in 1988, and he does not argue that that first proceeding violated his speedy trial right. Instead, defendant contends that the delay between that sentence and the sentence of death at issue here—approximately 14 years—violates his right to a speedy trial.

■   Defendant's constitutional right to the administration of justice without delay is not extinguished upon the commencement of the original trial in 1988, the return of the first jury's verdict, or the entry of the first judgment that sentenced defendant to death. Rather, the constitutional right extends to every component of the criminal prosecution, including the imposition of a sentence in accordance with applicable law.

As this case illustrates, one or more appeals of a judgment imposing a sentence for criminal conduct can produce proceedings on remand to the trial court that aim to correct legal errors and ultimately lead to a final judgment that satisfies all pertinent requirements for the determination of guilt and the imposition of a lawful sentence. Properly viewed, an appeal is a component of the criminal justice system that, by correcting errors in the trial, permits the trial court on remand to proceed with trial with a correct understanding of the law and to enter a lawful judgment. Throughout the processes of a criminal trial, appeal, and any further trial proceedings on remand, the constitutional right to the administration of justice without delay applies. In the context of the present case, that right extends through the jury's determination of the death eligibility factors set out in ORS 163.150(1)(b) and the entry of judgment in accordance with the jury's determination.

■ ■ This court evaluates three factors in determining whether the state has deprived defendant of his right to justice without delay: (1) the length of the delay; (2) the reasons for the delay; and (3) prejudice to defendant from the delay. *State v. Harberts*, 331 Or 72, 88, 11 P3d 641 (2000). Delay alone can violate a defendant's right to justice without delay if it is so long that it shocks the conscience or if the state purposely caused the delay to hamper the defense. *Id.* at 86.

Defendant agrees that the state has not purposefully caused delay in this case. However, defendant argues, the state has imprisoned him since 1984 on the basis of an incomplete trial due in large part to multiple defective penalty-phase proceedings and appeals from those proceedings. He contends that a delay of that magnitude is sufficient in and of itself to justify dismissal with prejudice. We disagree. When we view the state's conduct in its entirety, it is obvious that the considerable delay in this case has resulted in large part from repeated appeals concerning complicated and novel questions of law arising from the trial court's application of Oregon's death penalty statutes and amendments to those statutes. Every trial, appeal, and proceeding on remand in this case followed the pertinent rules that govern the administration of those proceedings, and defendant does not argue otherwise. Under the circumstances, and in the absence of any claim of vexatious delay by those who administer justice, the delay does not shock the judicial conscience. Consequently, we decline to dismiss this proceeding on the basis of the length of delay alone.

Because the delay here is substantially greater than average, we also must consider the reasons for the delay and prejudice, if any, to defendant. *State v. Mende*, 304 Or 18, 23-24, 741 P2d 496 (1987). As noted, almost all of the delay in this case is attributable to repeated appeals and further proceedings in the trial court on remand. Defendant assigns blame for those delays to the state because the state has continued to press for a death sentence. We reject that argument. State law authorizes the state to pursue a sentence of death for defendant's criminal acts. The state has not engaged in dilatory behavior or other vexatious conduct during the appellate process or in proceedings on remand. The attendant delay in those proceedings was burdensome to both sides in this litigation, but we cannot attribute blame for the delay to the state because it chose to seek a permissible, albeit legally complex, sentence.

We turn next to the issue of prejudice. Three kinds of prejudice are relevant to a speedy-trial claim: (1) the damage from lengthy pretrial incarceration; (2) anxiety and concern

resulting from public accusation of a crime; and (3) impairment of the ability to defend at trial. *Harberts*, 331 Or at 93. Defendant does not rely here on the first two forms of prejudice in that list, because his conviction for aggravated murder and this court's affirmance of that conviction in 1992 undermine any argument that those forms of prejudice continued to exist after that date.

Defendant does contend that he has suffered the third category of prejudice—impairment of the ability to defend at his sentencing—by reason of the delay caused by repeated appeals and remands in this case. We focus here on the "reasonable possibility of prejudice to the defense." *Id.* at 97. Defendant contends that he suffered a reasonable possibility of prejudice due to the deaths of his mother, his sister, and her two children in a tragic house fire on January 14, 1995. He acknowledges that a transcript of prior testimony of his mother is available to him, but he contends that his expert witness was unable to interview his mother regarding defendant's childhood development. He also asserts that his mother's testimony during the 1988 trial focused on the issue in ORS 163.150(1)(b)(B) (whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society) and not on the mitigation issue, and that his mother's testimony was truncated and superficial. He also argues that a transcript of his mother's testimony does not have the same force as a live witness pleading for her son's life. Defendant points out that his father also is deceased and is unavailable to testify regarding defendant's formative years. Defendant relies on the inability of a prison official, Carolyn Schnoor, to remember defendant's emotional response when he learned in prison of the deaths of his mother and sister in the house fire. Finally, defendant asserts that another potential witness, a shop supervisor at the prison, now is deceased.

The trial court considered but rejected defendant's claim of prejudice. On the basis of our review of the record, we agree. The transcripts of the testimony of witnesses in earlier proceedings are "admissible in the new sentencing proceeding," ORS 138.012(2)(b) (quoted below in full), and are not

"truncated" or "superficial," as defendant asserts. Defendant's expert witness did interview and examine reports "from quite a few people" regarding defendant's character, background, childhood, and family relationships. The expert noted that several members of defendant's family were deceased and, therefore, were not available for an interview. However, the record contains no evidence confirming that the deceased persons would have supplied any useful information or, particularly, that that information would support defendant's arguments against a sentence of death. The expert witness did testify in the 2002 penalty-phase proceeding on remand and did not opine at that time that his ability to prepare his testimony, including his expert opinion, was negatively influenced by the lack of access to deceased or forgetful witnesses. Finally, the record indicates that Schnoor was not present when defendant learned of the tragic deaths of family members in 1995, and that that explains her lack of memory of defendant's response to the news. We conclude that defendant has failed to demonstrate that the delay in his death penalty proceedings has created a reasonable possibility of prejudice to his ability to defend himself at the sentencing-phase proceeding. Therefore, we reject his claim that the state has failed to administer justice "without delay" under Article I, section 10 of the Oregon Constitution. For the same reasons, we reject defendant's speedy-trial claim under the Sixth Amendment to the United States Constitution.

### 3. Admission of Transcripts of Prior Testimony

■  During the 2002 penalty-phase proceeding, the trial court admitted more than 20 transcripts of prior witness testimony into evidence. Those transcripts contained testimony by witnesses who did not testify at the 2002 penalty-phase proceeding; all had testified in either the 1988 or the 1994 trial. Defendant objected to admission of those transcripts in the 1994 proceeding. However, he failed to object to the state's introduction of those transcripts during the 2002 proceeding. We explain below why defendant's failure to object during the 2002 proceeding leads us to conclude that this asserted error is not preserved.

Defendant argues that admission of those transcripts violated his right to confrontation under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution. The prior testimony was admitted pursuant to ORS 138.012(2)(b)—a statute that pertains to death penalty proceedings—which provides, in part:

> "A transcript of all testimony and all exhibits and other evidence properly admitted in the prior trial and sentencing proceeding are admissible in the new sentencing proceeding. Either party may recall any witness who testified at the prior trial or sentencing proceeding and may present additional relevant evidence."

OEC 804(3)(a) similarly provides that prior testimony is admissible if the witness is unavailable and the party against whom the testimony is offered had "an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Article I, section 11, provides, in part, "In all criminal prosecutions, the accused shall have the right * * * to meet the witnesses face to face[.]" The Sixth Amendment states, in part, "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him[.]" US Const, Amend VI.

We have previously held that admission of prior testimony pursuant to OEC 804(3)(a) does not violate a defendant's right to confrontation. *State v. Moen*, 309 Or 45, 85-86, 786 P2d 111 (1990) (if witness unavailable and opposing party had opportunity and similar motive to develop the testimony, then admission of transcripts of prior proceedings does not violate the state or federal constitution). The United States Supreme Court, in *Crawford v. Washington*, 541 US 36, 59, 124 S Ct 1354, 158 L Ed 2d 177 (2004), held that a trial court may admit testimonial statements of a witness absent from trial if that witness is unavailable and if the defendant had a prior opportunity to cross-examine that witness. *Crawford* does not call into question our holding in *Moen* regarding the admissibility of prior testimony that satisfies the requirements of OEC 804(3)(a).

*Moen,* however, does not address the constitutionality of ORS 138.012(2)(b) under the confrontation clauses of the Oregon or United States constitutions. That statute states that all testimony from the prior trials in a death penalty proceeding is admissible, but includes no requirement that the state show that the witness is unavailable or that the defendant had an opportunity for prior cross-examination. ORS 138.012(2)(b). We need not decide today if the failure to include those requirements renders the statute unconstitutional. We conclude from the present record that defendant had sufficient opportunity and motive to cross-examine the witnesses in the prior trials. Though it is unclear from the record whether all of the witnesses were unavailable, defendant failed to assert that objection to the admission of the prior testimony in the 2002 penalty-phase proceeding under review. *See State v. Pinnell,* 311 Or 98, 114-15, 806 P2d 110 (1991) (explaining that, generally, proponent of evidence must establish unavailability of witness). Therefore, nothing required the state to make a showing that the witnesses were unavailable. Even if we assume that the trial court erred in admitting the transcripts and that that error is plain, we conclude that it would not be appropriate to reach that error under these circumstances. As the state notes, if defendant had objected to the transcript testimony, the state may have been able to establish unavailability. We therefore decline to exercise our discretion to reach this unpreserved issue. *See State v. Cox,* 337 Or 477, 500, 98 P3d 1103 (2004) (declining to reach a Confrontation Clause claim brought under *Crawford* because defendant did not raise a timely objection to the testimony).

### 4. *Admission of Testimony of Dr. George Suckow*

In its case-in-chief, the state offered the testimony of Dr. George Suckow to opine on the second question to be considered by the jury in a death penalty case, *i.e.,* "[w]hether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." ORS 163.150(1)(b)(B).[8] Defendant argues on

---

[8] ORS 163.150(1)(b) sets forth four questions to be answered before a jury can impose the death penalty:

"Upon the conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

appeal that the trial court abused its discretion by allowing the state to ask Suckow a particular question on rebuttal, when, in defendant's view, that question attempted to introduce additional evidence not properly the subject of rebuttal testimony. Defendant also contends that the evidence, even with the allegedly improper testimony, was insufficient to support the jury's affirmative answer to the second death penalty question. We reject both arguments.

On direct examination, Suckow opined that defendant had "an antisocial personality" and that his history indicated a likelihood of being dangerous in the future. On redirect examination following defendant's cross-examination, Suckow testified that, in his opinion, defendant was "much more likely to be dangerous in the future than the average person is." Shortly after Suckow's testimony, the state rested its case.

Defendant's case included two experts whose testimony related, in part, to whether defendant would be a danger to others in the future. On rebuttal, the state called Suckow to address issues raised by defendant's experts. The state asked Suckow whether, in light of the testimony of defendant's experts, he could "tell this jury is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Defendant objected to that question on the ground that it was improper rebuttal, because the state had only inquired as to "dangerousness" in its case-in-chief, not as to whether there was a "probability that defendant would commit criminal acts of violence" in the future. The trial court overruled defendant's objection after the state clarified that it sought to elicit an opinion that took into account the new testimony.

"(A) Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;

"(B) Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;

"(C) If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and

"(D) Whether the defendant should receive a death sentence."

■■■■ We conclude that defendant's contention is not well-taken. Rebuttal evidence generally is limited to that necessary to answer the opponent's evidence. *State v. Fischer*, 232 Or 558, 563, 376 P2d 418 (1962). The trial court has broad discretion to allow rebuttal evidence when such evidence becomes relevant on rebuttal even if it could have been used in the case-in-chief. *Id.* Here, the testimony given by defendant's experts and by Suckow on rebuttal examination was related to the second question, which is often referred to as the "future dangerousness" question. *See, e.g., State v. Longo*, 341 Or 580, 604, 148 P3d 892 (2006) (noting that the second question required the state to prove the probability of "future dangerousness"). The state's question directly referred to evidence presented by defendant and did not exceed the scope of proper rebuttal. The trial court did not abuse its discretion.

■■■■ We also reject defendant's argument that the state failed to satisfy its burden of proof as to the second question. Defendant contends that the state was required to prove, beyond a reasonable doubt, that defendant will engage in criminal acts of violence. This is not what the statute requires. We rejected a similar argument in *Longo*, 341 Or at 604-05:

> "Defendant misses the important distinction between the fact being proved and the standard by which it is proved. The fact that the state must prove is the *probability* of future dangerousness, not any particular future criminal act. The standard of proof for that probability is beyond a reasonable doubt."

(Emphasis in original.) On the basis of our review of the record, we are satisfied that a rational juror could have found that the state had proven, beyond a reasonable doubt, a probability that defendant would commit future criminal acts of violence. *See State v. Williams*, 313 Or 19, 24, 828 P2d 1006 (1992) (setting forth standard for reviewing challenge to the sufficiency of the evidence).

We have examined each of defendant's other penalty-phase assignments of error and the arguments made in

support thereof.[9] As to those other assignments of error, we conclude that they are without merit.

The sentence of death is affirmed.

---

[9] The author of the court's opinion, Durham, J., speaking for himself alone, states the following: When defendant committed murder on December 22, 1984, Ballot Measure 7, which took effect on December 6, 1984, *see note accompanying* Oregon Laws 1985, ch 3, described the death penalty procedures that governed defendant's prosecution. That statute unambiguously required the trial judge to sentence a defendant to death if the penalty-phase jury reported affirmative answers to three statutory questions. Or Laws 1985, ch 3, § 3(5).

In *Penry v. Lynaugh*, 492 US 302, 109 S Ct 2934, 106 L Ed 2d 256 (1989), the United States Supreme Court held that a similar Texas statute did not validly authorize a death sentence because it did not provide for jury consideration of mitigating factors that would support imposition of a sentence less than death. *Penry* appeared to render similarly defective statutes, like Oregon's, invalid. But, in a divided opinion, a majority of this court avoided the holding in *Penry* by altering Oregon's statute under the guise of "interpreting" it. *State v. Wagner*, 309 Or 5, 786 P2d 93 (1990) (*Wagner II*). The majority in *Wagner II* ordered the inclusion of a fourth question, regarding mitigating factors, for jury consideration even though neither Oregon's legislature nor the people had authorized that procedure.

Elsewhere, I have expressed the view that the ruling in *Wagner II* is unsupportable and that this court should overturn that decision. *See State v. Guzek*, 336 Or 424, 465, 86 P3d 1106 (2004) (Durham, J., concurring); *State v. Montez*, 324 Or 343, 346-47 n 5, 927 P2d 64 (1996); *State v. Pinnell*, 319 Or 438, 449, 887 P2d 635 (1994) (Durham, J., dissenting). That view, if accepted, would result in the invalidation of the statutory penalty scheme under which defendant was sentenced to death. To advance that viewpoint, a defendant is obligated to assert the argument and explain why intervening legislative amendments to Oregon's death penalty statutes are not effective to cure the problem discussed in *Penry* in regard to an aggravated murder committed in 1984. Defendant has not assumed that obligation.

An Oregon governor considering an Oregon prisoner's potential execution may consider issues surrounding the validity of the prisoner's death sentence without regard to the preservation of those legal issues in the courts. But a defendant's failure to assert the argument noted above is a barrier to consideration of it by this court. Because defendant has not argued that his death sentence is flawed for the reason noted above, the court has no basis for examining the question.