432    October 30, 2014    No. 68

IN THE SUPREME COURT OF THE
STATE OF OREGON

STATE OF OREGON
*Respondent,*
*v.*
ANGELA DARLENE McANULTY,
*Appellant.*
(CC 200927457; SC S059476)

En Banc

On automatic and direct review of the judgment of conviction and sentence of death imposed by the Lane County Circuit Court.

Kip W. Leonard, Judge.

Argued and submitted March 20, 2014.

Daniel J. Casey, Portland, argued the case and filed the briefs for appellant.

Timothy A. Sylwester, Assistant Attorney General, filed the brief and argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Jamie Contreras, Assistant Attorney General.

BALDWIN, J.

The judgment of conviction and sentence of death are affirmed.

**BALDWIN, J.**

This case is before us on automatic and direct review of defendant's judgment of conviction by guilty plea and sentence of death, following a penalty-phase trial before a jury, for one count of aggravated murder. *See* ORS 163.095; ORS 138.012(1); ORAP 12.10. For the reasons stated below, we affirm defendant's judgment of conviction and sentence.

## I.  BACKGROUND

We begin with an overview of the facts admitted into evidence during defendant's penalty-phase trial. *See State v. Acremant*, 338 Or 302, 305, 108 P3d 1139, *cert den*, 546 US 864 (2005) (reciting facts from penalty-phase evidence where defendant pleaded guilty to aggravated murder); ORS 163.150(1)(a) (regarding procedures for penalty-phase proceedings).

In 1994, defendant gave birth to her daughter, Jeanette, in California. Approximately one year later, defendant lost custody of Jeanette due to drug use, neglect, and physical abuse. Several years later, defendant gave birth to another daughter, P, and regained custody of Jeanette.

Defendant then met and married Richard, giving birth to their son, R, shortly thereafter. Richard became Jeanette's stepfather. In early 2006, the family moved to a house on Robin Avenue in Eugene, Oregon, and Jeanette enrolled in middle school. Jeanette's classmates and teachers soon noticed that Jeanette appeared skinny and was always hungry. While at school, Jeanette's friends shared food with her, and she obtained food from lunch aides.

Around that time, Jeanette wrote a letter to a school official explaining that she was denied food at home, forced to eat chili peppers, and forced to sit on her knees for long periods of time for punishment. School officials alerted the Department of Human Services (DHS), which opened an investigation into the allegations. A DHS caseworker interviewed and conducted a home visit at that time; however, after gathering conflicting statements from family members and observing the family home stocked with food, DHS ultimately closed the file as "unable to determine." After school

officials and a parent of one of Jeanette's friends made additional reports to DHS about suspected abuse, defendant removed Jeanette from school and homeschooled her. Defendant did not homeschool her other two children.

In the home, defendant treated Jeanette differently from her other children. Jeanette was not allowed to speak with her siblings. Defendant put locks on the kitchen cupboards and controlled Jeanette's eating. She provided Jeanette with less food than she gave to the rest of the family and sometimes forced Jeanette to forgo meals. Defendant also controlled what Jeanette drank. Defendant removed hose spigots, turned off the water supply under the sinks, and installed locks on the bathroom. She forced Jeanette to obtain permission before drinking or using the restroom, and sometimes denied Jeanette water or use of the bathroom.

Defendant also subjected Jeanette to physical punishment for purported disobedience, but did not similarly target P or R. Defendant would force Jeanette to eat hot peppers, or stand or kneel in a corner for long periods of time, sometimes while holding heavy objects. Defendant punched, slapped, scratched, and kicked Jeanette all over her body, causing bruising and cuts and sometimes knocking out her teeth. Defendant also would repeatedly whip Jeanette's bare back, bottom, and legs with belts and sticks, causing lacerations that would bleed. Defendant often isolated Jeanette in a single bedroom to commit the violent acts, and turned on the vacuum or turned up the volume on the television to prevent others from overhearing. After the most violent attacks, defendant put iodine on Jeanette's wounds and attempted to bandage the injuries herself, declining to seek professional medical or dental care for Jeanette. Richard did not intervene or pursue treatment for Jeanette's injuries.

During the summer of 2009, after Richard suffered a heart attack, the family moved from their house on Robin Avenue to a home on Howard Avenue. Defendant's abuse, torture, and starvation of Jeanette intensified at that residence. Jeanette lost weight and sustained serious physical injuries, some of which became infected. In early December, Jeanette suffered a significant blow to her head, after which she appeared confused and had difficulty walking

or standing. On December 9, 2009, Jeanette fell asleep on the floor and became unresponsive. Defendant and Richard placed Jeanette in the bathtub and called Richard's mother, who told them to call 9-1-1. Richard then called 9-1-1. Emergency responders arrived and rushed Jeanette to the hospital, where she was pronounced dead. Given the severity of Jeanette's prolonged starvation, dehydration, physical injuries and localized infections, authorities were unable to pinpoint a single cause of death. The cause of death instead was listed as "multifactoral abuse and neglect."

Defendant and Richard accompanied investigators to the sheriff's office for questioning. Before leaving the hospital, defendant and Richard privately discussed assigning blame to Richard and the possibility that authorities might impose a lighter sentence on him as a result of his heart condition. At the sheriff's office, detectives separated the couple, read them their *Miranda* rights, and interviewed them. Richard initially told authorities that he had "spanked" Jeanette, but later admitted that he had not been truthful and had agreed to take the blame. Defendant also initially assigned blame to Richard, but then later made self-incriminating statements.

Detectives executed search warrants for both the Howard Avenue and Robin Avenue homes, where police discovered blood and other DNA evidence and observed an apparent attempt to sanitize some of that evidence. Also recovered from a garbage bin at the Howard Avenue home were several blood-stained items, including sticks, belts, clothing, bedding, and a piece of cardboard on which defendant forced Jeanette to sleep.

The state charged defendant by indictment with one count of aggravated murder, ORS 163.095, and one count of tampering with physical evidence, ORS 162.295. Before trial, defendant moved to suppress the statements that she had made to detectives. The trial court denied the motion. On the first day of trial, defendant pleaded guilty to the offenses charged. The case proceeded to a penalty-phase trial before a jury to determine defendant's sentence on the aggravated murder conviction. At the conclusion of trial, the

jury unanimously returned affirmative findings to each of the following questions under ORS 163.150(1)(b):

> "(A)   Whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that death of the deceased or another would result;
>
> "(B)   Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society;
>
> "(C)   If raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased; and
>
> "(D)   Whether the defendant should receive a death sentence."

The trial court sentenced defendant accordingly, and this court's automatic and direct review of defendant's conviction and sentence followed.

## II.   ANALYSIS

On review, defendant raises 18 assignments of error. We have reviewed all assignments of error, and we conclude that defendant's first assignment of error relating to the trial court's ruling on her motion to suppress is well taken. However, we further conclude that the error was harmless. We begin with that assignment of error, followed by defendant's remaining assignments that merit discussion.[1]

### A.   *Denial of Pretrial Motion to Suppress*

Before trial, defendant moved to suppress statements that she had made to detectives in four interrogations that occurred during the day following Jeanette's death. Defendant argued that the statements had been obtained in violation of her right to remain silent under Article I, section 12, of the Oregon Constitution[2] and the Fifth Amendment to

---

[1] We address in detail four assignments of error and one aspect of a fifth assignment of error. We reject without discussion the remaining issues that defendant raises, because those issues are either unpreserved, have already been decided adversely to defendant's position, or otherwise lack merit.

[2] Article I, section 12, of the Oregon Constitution provides, in part, "No person shall * * * be compelled in any criminal prosecution to testify against himself."

the United States Constitution.[3] The trial court denied the motion, and defendant entered an unconditional guilty plea to the charges against her. Defendant's case then proceeded to the penalty phase, and defendant's statements to detectives were admitted without objection.

Defendant first assigns error to the trial court's denial of her motion to suppress. As a threshold matter, however, the state argues that this court cannot review defendant's challenge. The state notes that defendant failed, when entering her guilty plea, to make it conditional by reserving "in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion." ORS 135.335(3). As a result, the state contends that defendant's claim that the trial court erred by denying her pretrial motion to suppress is not reviewable under ORS 138.050(3) (limiting issues reviewable on appeal from sentence on plea of guilty or no contest).

Whether this court, on automatic and direct review of a sentence of death, may review a defendant's challenge to a pretrial ruling when the defendant has failed to comply with ORS 135.335(3) is an issue of first impression.[4] We examine that issue first, because its resolution controls whether this court may review defendant's first assignment of error.

    1.   *Threshold issue of reviewability*

It is a "well-settled principle that '[a] party does not have an inherent right to appellate court review;'" rather, the party must show that the matter from which appeal is taken is appealable under a provision of law. *State v. Cloutier*, 351 Or 68, 74, 261 P3d 1234 (2011) (alteration in original; quoting *Waybrant v. Bernstein*, 294 Or 650, 653, 661 P2d 931 (1983)). ORS 138.012(1) provides this court with original jurisdiction in death penalty cases:

---

[3] The Fifth Amendment to the United States Constitution provides, in part, "No person *** shall be compelled in any criminal case to be a witness against himself[.]"

[4] This court has previously reviewed a pretrial ruling in a capital case where the defendant had entered an unconditional guilty plea and trial had been limited to the penalty phase. *See Acremant*, 338 Or at 317. However, the parties in that case did not advance the reviewability argument that the state now raises, and, consequently, the court did not address the issue.

> "The judgment of conviction and sentence of death entered under ORS 163.150(1)(f)[5] is subject to automatic and direct review by the Supreme Court."

*See also* ORAP 12.10 (specifying rules for automatic review of death sentence cases).

The state does not dispute that ORS 138.012 provides this court with original jurisdiction over this appeal. Rather, the state contends that other statutory provisions apply to limit this court's scope of review. Specifically, the state construes the text of ORS 138.012 as providing only a jurisdictional grant that does not control the permissible range of appellate review. The state points to ORS 138.050 and ORS 138.222, which include provisions that limit appellate review in criminal cases where a defendant has pleaded guilty or no contest without qualification and without invoking ORS 135.335(3). Because defendant entered an unconditional guilty plea and did not comply with the requirements of ORS 135.335(3), the state contends that those limitations apply.

The state relies on the following text in ORS 138.050:

> "(1)   Except as otherwise provided in ORS 135.335, a defendant who has pleaded guilty or no contest may take an appeal from a judgment or order described in ORS 138.053 only when the defendant makes a colorable showing that the disposition:

> "(a)   Exceeds the maximum allowable by law; or

> "(b)   Is unconstitutionally cruel and unusual.

> "* * * * *

> "(3)   On appeal under subsection (1) of this section, the appellate court shall consider only whether the disposition:

> "(a)   Exceeds the maximum allowable by law; or

> "(b)   Is unconstitutionally cruel and unusual."

---

[5] ORS 163.150(1)(f) requires that, if a jury returns affirmative findings on each of the four questions required to impose the death penalty, the trial court must sentence the defendant to death. *See also* ORS 163.150(1)(b) (setting out four questions for the jury).

As applied to this case, the state reads ORS 138.050(3) as limiting appellate review to consideration of only the judgment or order described in ORS 138.053,[6] except as otherwise provided in ORS 135.335. The state argues that a judgment or order under ORS 138.053 does not include a disposition on a pretrial ruling and that the exception for ORS 135.335 that would permit a broader scope of review does not apply here because defendant failed to enter a conditional plea. *See* ORS 135.335(3).

The state also relies on the following text of ORS 138.222:

"(1)  Notwithstanding the provisions of ORS 138.040 and 138.050, a sentence imposed for a judgment of conviction entered for a felony committed on or after November 1, 1989, may be reviewed only as provided by this section.

"* * * * *

"(4)  In any appeal, the appellate court may review a claim that:

"(a)  The sentencing court failed to comply with requirements of law in imposing or failing to impose a sentence;

"* * * * *

"(7)  Either the state or the defendant may appeal a judgment of conviction based on the sentence for a felony committed on or after November 1, 1989, to the Court of Appeals subject to the limitations of chapter 790, Oregon Laws 1989. The defendant may appeal under this subsection only upon showing a colorable claim of error in a proceeding if the appeal is from a proceeding in which:

"(a)  A sentence was entered subsequent to a plea of guilty or no contest * * *."

In the state's view, because defendant's sentence was entered subsequently to her guilty plea, ORS 138.222(4)(a) limits review to consideration of either the lawfulness of a sentence

---

[6] ORS 138.053 designates five dispositions as subject to the appeal provisions and limitations on review under ORS 138.050. The first two dispositions relate to sentencing, specifically the "[i]mposition of a sentence on conviction," ORS 138.053(1)(a), and the "[s]uspension of imposition or execution of any part of a sentence," ORS 138.053(1)(b); the other three relate to probation. *See* ORS 138.053(1)(c) - (e).

or whether an error occurred in imposing the sentence. The state contends that those limitations preclude review of the pretrial ruling on defendant's motion to suppress.

The state's position on review consists of two overlapping propositions. First, because nothing in ORS 138.012(1) purports to prescribe any scope of review, that statute does not supersede or exempt this court in reviewing a death penalty case from the scope of review limitations imposed by ORS 138.050(3) and ORS 138.222(4)(a). Second, the limited review in this case is a direct consequence of defendant's failure to comply with the conditional plea process outlined in ORS 135.335(3).

   a.   Scope of review

We first address the scope of review issue before examining the effect of the conditional plea statute in more detail. The state is correct that ORS 138.050 and ORS 138.222 impose significant limitations on the scope of review in criminal cases that fall within their purview. However, the state's reading of those provisions overlooks significant textual and contextual clues that demonstrate that the legislature intended the appeals undertaken in ORS 138.050 and ORS 138.222 to be distinct from the automatic and direct review process that occurs in death penalty cases. As a result, as explained below, we conclude that the legislature did not intend the scope of review limitations provided under ORS 138.050 and ORS 138.222 to apply to limit a direct death penalty review in this court. We arrive at that conclusion by examining the text and context of the various statutes. *See State v. Gaines*, 346 Or 160, 171-73, 206 P3d 1042 (2009) (describing methodology). We also consider this court's prior construction of the statutes at issue. *Blacknall v. Board of Parole*, 348 Or 131, 141-42, 229 P3d 595 (2010).

To begin, the text of ORS 138.012(1) contrasts significantly with the text of ORS 138.050 and ORS 138.222. As noted, ORS 138.012(1) provides for "automatic and direct review by the Supreme Court" in all cases in which a jury convicts a defendant of aggravated murder and answers the relevant death penalty questions outlined under ORS 163.150(1)(b) in the affirmative. Under that statute, an appeal to this court occurs as a matter of course after the

imposition of a death sentence, bypassing any intermediate review that the Court of Appeals would typically conduct. This court has reviewed death sentences in a manner consistent with that textual interpretation. *See, e.g.*, *State v. Montez*, 309 Or 564, 789 P2d 1352 (1990) (engaging in automatic and direct review; noting that review considered mandatory). *See also* ORAP 12.10(1) ("Whenever a defendant is sentenced to death, the judgment of conviction and sentence of death are subject to automatic and direct review by the Supreme Court without the defendant filing a notice of appeal.").

In contrast to the automatic and direct review provided under ORS 138.012(1), ORS 138.050 expressly refers to an appeal process that is not mandatory and is not initiated in this court. In *Cloutier*, 351 Or 68, this court undertook an extensive examination of the meaning and history of ORS 138.050. The court explained that ORS 138.050 must be read with ORS 138.040 and that, taken together, those provisions authorize appeal and review of sentences for criminal offenses. *Cloutier*, 351 Or at 91. Of particular significance to this case, as the text of those provisions makes clear, an appeal in such criminal cases is at a defendant's option and goes before the Court of Appeals; there is no right of appeal to or review by this court. ORS 138.040(1) provides a wide scope of review on appeal, but ORS 138.040 does not encompass the process for appeal from a sentence on a plea of guilty or no contest as provided for under ORS 138.050.

Similarly, ORS 138.050 states that "a defendant who has pleaded guilty or no contest *may take an appeal* from a judgment or order" if the defendant makes a colorable showing that the disposition meets either of the two conditions described therein. ORS 138.050(1) (emphasis added). Depending on the court in which the judgment or order originates, ORS 138.050 provides that the appeal be taken either "to the Court of Appeals" or "to the circuit court for the county." ORS 138.050(2). Thus, the text of ORS 138.050 shows that, for appeals from criminal convictions and sentences, the legislature envisioned a voluntary process that provides for intermediate review in the Court of Appeals. That procedure is distinct from the automatic and direct review provided under ORS 138.012.

ORS 138.222 authorizes an appeal in the Court of Appeals at defendant's option. In 1989, the legislature adopted ORS 138.222 as part of a package of new sentencing guidelines legislation. That statute expressly authorizes appeal of convictions from pleas of guilty or no contest, and states that "[e]ither the state or the defendant *may appeal*" from a judgment of conviction and sentence in such cases. ORS 138.222(7) (emphasis added). Under the terms of the statute, such an appeal is made "to the Court of Appeals." *Id.* Thus, as with ORS 138.050, ORS 138.222 contemplates a criminal appeal that is initiated by the defendant filing a notice of appeal in the Court of Appeals.

The text of ORS 138.222 provides that, "[n]otwithstanding the provisions of ORS 138.040 and 138.050, a sentence imposed for a judgment of conviction entered for a felony committed on or after November 1, 1989, *may be reviewed only as provided by this section.*" ORS 138.222(1) (emphasis added); *see also Cloutier*, 351 Or at 91 (noting that ORS 138.222 governs appeal and review of sentences imposed for felonies). ORS 138.222 then sets forth various limitations on the permissible scope of review on appeal, including provisions that apply to sentences of probation, sentences of imprisonment, and sentences that depart from the presumptive sentencing range. ORS 138.222 makes no reference to a sentence of death.

Significant distinctions also exist between the remand provisions of ORS 138.222 and ORS 138.012. For example, ORS 138.012 permits review of both the guilt and penalty phases of a death penalty case. If this court determines that prejudicial error occurred in the penalty phase, ORS 138.012(2)(a) provides that a sentence of death may be set aside. It specifies the procedure to occur on remand, which, depending on the course that the state elects, requires the trial court either to sentence a defendant to imprisonment for life pursuant to ORS 163.105(1)(c) or to empanel a jury to determine whether a defendant should again be sentenced to death pursuant to ORS 163.150(1)(f). ORS 138.222 makes no reference to such a process in its remand provisions. *See* ORS 138.222(5)(a). Those inconsistencies suggest an intention that the two statutes will apply in different settings.

This court's case law also suggests that the automatic and direct review provided under ORS 138.012(1) is unique. The court has recognized that a death sentence is different both in the legislative enactments that control how it is enforced and in the overall significance of the penalty. In *State v. Haugen*, 349 Or 174, 243 P3d 31 (2010), this court declined to apply ORS 137.123—which governs consecutive sentences—to a sentence of death, because it determined that that statute was inconsistent with the more specific statutes permitting a death sentence for aggravated murder. The court explained that

> "[t]he statutes providing for the imposition of a sentence of death are a more specific expression of legislative intent when compared with a sentence of incarceration, because a sentence of death is exceptional. For that reason, \*\*\* the legislature has enacted a number of specific statutes to regulate the manner in which a death sentence moves toward the issuance of a death warrant and the date of execution."

*Id.* at 203-04; *see also State v. Guzek*, 322 Or 245, 264, 906 P2d 272 (1995) (*Guzek II*) ("Capital cases require our most vigilant and deliberative review. We agree \*\*\* that '[d]eath is a punishment different from all other sanctions in kind rather than degree' so that 'there is a difference in the need for reliability in the determination that death is the appropriate punishment in a specific case.'" (quoting *Woodson v. North Carolina*, 428 US 280, 303-05, 96 S Ct 2978, 49 L Ed 2d 944 (1976)).

In sum, we conclude that the legislature did not intend the scope of review limitations contained in ORS 138.050 and ORS 138.222 to apply to this court's automatic and direct review of a conviction and sentence of death under ORS 138.012(1). Further, nothing in ORS 138.012(1) purports to limit this court's ability to review defendant's assignment of error. Consequently, we may review defendant's challenge under ORS 138.012(1). That conclusion, however, does not directly answer what effects, if any, flow from defendant's failure to enter a conditional plea pursuant to ORS 135.335(3). We therefore turn to that issue.

b.   Effect of unconditional plea

ORS 135.335 was originally enacted in 1973 to permit pleas of guilty, not guilty, and no contest. *See* Or Laws 1973, ch 836, § 159. The statute was amended in 1999 to add a further provision permitting a defendant to enter a conditional guilty plea. *See* Or Laws 1999, ch 134, § 1. The statute now provides, in part:

> "With the consent of the court and the state, a defendant may enter a conditional plea of guilty or no contest reserving, in writing, the right, on appeal from the judgment, to a review of an adverse determination of any specified pretrial motion. A defendant who finally prevails on appeal may withdraw the plea."

ORS 135.335(3).

The 1999 enactment of subsection (3) of ORS 135.335 has two primary effects. First, for criminal defendants who plead guilty or no contest, it gives them a statutorily recognized path to obtain appellate review of a pretrial ruling. *See* Or Laws 1999, ch 134, § 1. Previously, a defendant who had pleaded guilty or no contest to a criminal charge had no procedural way to challenge a trial court's ruling on a pretrial motion. As this court observed in *State v. Dinsmore*, 342 Or 1, 6-7, 147 P3d 1146 (2006), before 1999, a defendant who, for example, was unsuccessful in pretrial efforts to suppress evidence was typically required to enter a plea of not guilty and proceed to trial—often a trial on stipulated facts—to preserve the ability to contest the adverse pretrial ruling on that motion.

Second, the enactment of ORS 135.335(3) provides a statutory mechanism for a criminal defendant to later withdraw a guilty plea if that defendant prevails in challenging the pretrial ruling reserved for review. As the last sentence of that subsection states, a defendant who is successful on appeal may withdraw his or her plea and enter a new plea of guilty, not guilty, or no contest. If a defendant withdraws the plea and enters a plea of not guilty, then that defendant may proceed to trial with the benefit of a successful challenge to an earlier pretrial ruling. *See also Dinsmore*, 342 Or at 7 ("[W]hen a conditional plea is entered

as an expediency under ORS 135.335(3), the parties begin anew on the charges subject to the plea if the defendant's appeal is successful and the defendant opts to withdraw the conditional plea.").

But, by providing a mechanism to obtain review on a pretrial ruling and later withdraw a guilty or no contest plea, the text of ORS 135.335(3) carries with it an implicit limitation. Specifically, if a criminal defendant does not enter a conditional plea, the provisions of subsection (3) do not apply. Thus, a defendant does not have the benefit of a statutorily recognized path for appellate review. Even if a separate provision of law nonetheless permits appellate review, the defendant would have no statutorily recognized right to later withdraw her guilty or no contest plea on the basis that a particular pretrial ruling constituted reversible error. Thus, the plea would remain intact, effectuate a waiver of the right to trial, and result in a conviction of the offense for which the plea was entered. *See also* ORS 135.345 (regarding effect of no contest plea).

Here, in entering her guilty plea, defendant did not attempt to reserve in writing her ability to challenge the trial court's adverse determination on any specified pretrial ruling. Although this court may review defendant's assignment of error pursuant to ORS 138.012(1), defendant's failure to comply with ORS 135.335(3) precludes a withdrawal of her plea. Defendant's conviction therefore remains intact, effectuates a waiver of the right to trial, and results in a conviction on the charged offenses.

The state, however, advances a further effect of ORS 135.335(3) in relation to defendant's claim of error. In the state's view, defendant's unconditional guilty plea amounted to a complete waiver of any claims relating to the adverse pretrial rulings. Because defendant did not renew her objection to the admission of the evidence during the penalty trial, the state maintains that defendant cannot now challenge the admission of those statements during the penalty phase. We disagree. Although the functional effect of defendant's unconditional plea precludes her from obtaining a reversal of her conviction through a challenge to the trial court's pretrial ruling on her motion to suppress,

we find nothing in the text or context of ORS 135.335(3) that prevents her from challenging, on automatic and direct review, the ruling as it relates to the imposition of her death sentence.[7] Moreover, ORS 163.150(1)(a) prohibits the admission, during penalty proceedings, of "any evidence secured in violation of the Constitution of the United States or of the State of Oregon." In other words, the merits of the arguments made in defendant's pretrial motion also apply to the penalty-phase proceedings.

As the state points out, during the penalty phase, defendant did not object to the admission of defendant's statements that were the subject of defendant's pretrial motion to suppress. On review, however, we find applicable the rule of preservation that permits a reviewing court to consider issues previously litigated and decided notwithstanding a lack of relitigation at trial. *See State v. Foster*, 296 Or 174, 183-84, 674 P2d 587 (1983) (concluding that pretrial motion preserved issue notwithstanding lack of relitigation at trial because a sufficient offer of proof was made "to permit the court to rule intelligently" and "the judge gave a final ruling"); *see also State v. Pitt*, 352 Or 566, 574-75, 293 P3d 1002 (2012) (same); *Acremant*, 338 Or 302 (death penalty case where defendant pleaded guilty and the court considered the defendant's challenge to an adverse pretrial ruling when defendant had made no objection at the penalty trial and scope of review was not contested).

Defendant argued in her pretrial motion to suppress that her statements were inadmissible because they were obtained in violation of her constitutional rights. The trial court held a hearing on the issue, considered the evidence, and made findings of fact and conclusions of law. Thus,

---

[7] Aggravated murder trials are typically divided into two proceedings: the guilt phase and the penalty phase. *State v. Pratt*, 309 Or 205, 210, 785 P2d 350 (1990). In most cases, guilt and penalty proceedings "are merely separate phases of the same trial in which the same jury decides, first, whether the defendant is guilty and, second—if the defendant is guilty—whether the defendant should receive the death penalty." *State ex rel Carlile v. Frost*, 326 Or 607, 613, 956 P2d 202 (1998) (citing *State v. Montez*, 324 Or 343, 348-49, 927 P2d 64 (1996), *cert den*, 520 US 1233 (1997)). If a defendant pleads guilty, a jury is impaneled and sworn for only a penalty-phase proceeding. ORS 163.150(1)(a) ("If the defendant has pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose."); *see also* ORS 138.012(2) (regarding procedure for penalty phase when on remand for resentencing).

defendant alerted the trial court to the purported error, and the court considered the merits of defendant's motion and ruled on it. After defendant entered her plea, the trial court empanelled a jury for a penalty-phase trial. At the time the evidence was admitted during the penalty phase, the trial court was on notice of defendant's position regarding that evidence. *See Foster*, 296 Or at 183-84; *Pitt*, 352 Or at 574. *See also* ORS 163.150(1)(a) (prohibiting the admission of "any evidence secured in violation of the Constitution of the United States or of the State of Oregon").

We therefore conclude that we may consider defendant's first assignment of error on automatic and direct review under ORS 138.012(1).[8] However, as a result of defendant's unconditional plea, she cannot now withdraw her plea, and her conviction remains intact. Accordingly, we examine her challenge to the trial court's ruling on her pretrial motion to suppress only as it relates to the penalty phase of her trial. We now turn to the merits of defendant's suppression argument.

### 2.   *Right against self-incrimination*

Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United Stated Constitution both protect against compelled self-incrimination. Pursuant to those provisions, a criminal defendant's admissions will ordinarily be suppressed if they are obtained in violation

---

[8] The approach that we take in this case does not necessarily extend to other types of cases or other types of evidence that may be admitted during penalty-phase proceedings. As this court has explained:

"[E]ven if a trial judge has denied a pretrial motion to exclude evidence, the moving party (and other parties) are well advised to consider making the same or other objections, if warranted, when a party offers the evidence during trial. An objection during trial allows a judge to reevaluate the issue of admissibility in light of what has occurred at trial, including whether the anticipated evidence or the parties' arguments have changed since the court denied the motion *in limine*. An objection at trial to the admission of certain evidence also may help refine the evidentiary issues for appellate review."

*Pitt*, 352 Or at 574. It bears mentioning that relitigation may, in some instances, be required to preserve a claim of error in penalty proceedings, particularly in cases where the evidence relates to a purpose not previously relevant or considered. *See* ORS 163.150(1)(a) (permitting admission in penalty phase of evidence "as to any matter that the court deems relevant to sentence," which includes victim impact evidence or proof of aggravating or mitigating circumstances). Such an instance is not present here.

of the right to remain silent or are the product of coercion. *See, e.g.*, *State v. Vondehn*, 348 Or 462, 474-75, 236 P3d 691 (2010); *Mincey v. Arizona*, 437 US 385, 397-98, 98 S Ct 2408, 57 L Ed 2d 290 (1978). Defendant contends that the trial court should have suppressed statements that she made to detectives in four interrogations following Jeanette's death.[9] Defendant points to three invocations of her right to remain silent that occurred during the first interrogation. She argues that detectives persisted in questioning her after each of those invocations and that, as a result, the statements that followed were obtained in violation of her rights. She further contends that those violations created a coercive environment that carried forward through the subsequent interrogations and created the impression that the continued assertion of her rights would be meaningless. As a result, defendant submits that all statements that followed her invocations—even those occurring in subsequent interrogations—must be suppressed.

We review defendant's challenge for errors of law. *See* *State v. James*, 339 Or 476, 481, 123 P3d 251 (2005). In doing so, we are "bound by the trial court's findings of historical fact if evidence in the record supports them." *Id.* (citing *Ball v. Gladden*, 250 Or 485, 487-88, 443 P2d 621 (1968)). As we will explain, we conclude that defendant's right to remain silent was violated when detectives continued questioning her after her second and third invocations that occurred during her first interrogation. We further conclude, however, that her statements in subsequent interrogations were voluntary and that any error in admitting the statements from the first interrogation was harmless.

a.   First interrogation

On December 9, after Jeanette was pronounced dead, defendant voluntarily accompanied investigators to the sheriff's station from the hospital. Defendant rode uncuffed in the front seat of an unmarked patrol car, and Richard followed in a separate patrol car. At the station, defendant remained in a room for approximately one hour while detectives interviewed Richard in another room. A detective was

---

[9] During the pretrial hearing on defendant's motion to suppress, the parties agreed that four separate interviews occurred. We follow that framework.

either in the room with defendant or was standing outside the room during that time.

At about 1:00 a.m. on December 10, Detectives Fenley and Hoberg moved defendant to an interview room and began her first interrogation. The detectives read defendant her *Miranda* rights. Defendant said that she understood her rights and signed a form to that effect. Defendant was not handcuffed or placed under arrest, and the detectives told her that the interview was optional and would be recorded.

The first interrogation lasted approximately one hour and 45 minutes. Fenley and Hoberg took turns asking questions. Defendant initially told detectives that only Richard had "spanked" Jeanette and had put her on time-outs. She blamed many of Jeanette's injuries on Jeanette's own clumsiness and her "picking" at her scabs. Defendant provided various explanations for Jeanette's low weight, but generally maintained that Jeanette ate "a lot." Defendant also explained that she had turned the water off under the sinks to prevent Jeanette from drinking at night. Defendant eventually admitted to personally "spanking" Jeanette, but claimed she had done so only three times. She also admitted to using a belt during the "spankings" and to giving Jeanette a "pat on the butt" with a stick. Defendant stated that some blood evidence in the home was the result of a belt causing Jeanette's scabs to break open. She also admitted that she had cleaned up some of the evidence of Jeanette's physical injuries.

After about an hour, defendant asked "Can I see my husband?," to which Fenley responded, "I can't promise you that." Defendant then asked, "Can I please go out of here?," to which Fenley responded, "I think we're close to being done, then you can go out of here." The following exchange then occurred:

"DEFENDANT:   I want to go see my husband, please, let me go see my husband. *** [P]lease let me go see him, please.

"HOBERG:   Well, the reason, you know, obviously we—

"DEFENDANT:   Is it because he doesn't want to see me?

[FIRST INVOCATION]

"HOBERG:   No, the reason that we keep you separated is because we have to get your story and his story, if we get them combined—

"DEFENDANT:   *I'm done, I don't want to talk anymore.*"

(Emphasis added).

The interrogation continued for a short period of time with defendant making statements, asking questions, and occasionally asking to see Richard. Detectives generally did not attempt to solicit additional information at that time, but did ask some clarifying questions in response to defendant's statements and questions. Then the following exchange occurred:

"HOBERG:   Well, if you don't want to talk, the[n] I'm going to (inaudible).

"DEFENDANT:   I don't know what else to say. * * *

"HOBERG:   Well, I mean, *I'm not going to ask you any questions because you said you didn't want to talk to me anymore.*

"DEFENDANT:   *No, I was just letting you know that I did tell you everything—*

"HOBERG:   Yeah.

"DEFENDANT:   —and you said to be honest with you, and I was honest with you.

"HOBERG:   Well, I had some more questions, as far as like, I mean, you don't have to answer these (inaudible).

"DEFENDANT:   Are these more questions on what I did?

"HOBERG:   It's about, like you said you went to church and stuff, I had some questions about that, but you don't have to answer them, you said you didn't want to talk anymore, so, I don't want to, I'm not making you talk more.

"DEFENDANT:   I know.

[SECOND INVOCATION]

"HOBERG:   Do you not want to answer those?

"DEFENDANT:   *I don't want to talk no more.* I'm sorry. I just—

"HOBERG:   *That's fine.*"

(Emphases added).

Hoberg left defendant alone in the room. After a one minute pause, Hoberg reentered the room and asked:

"HOBERG:   Another quick thing[;] *** [Y]ou said you take her to *** Winco or church or whatever. *** [W]ho was the last *** person outside the home to see her?

"DEFENDANT:   At Winco?

"HOBERG:   Or anywhere ***.

"*****

"We just want to talk to somebody that's seen her.

"DEFENDANT:   No, I don't want to, I'm sorry.

"HOBERG:   You don't want us to talk to anybody that's seen her?

"DEFENDANT:   Well, I don't want them to think that I didn't, think I killed her. You know."

The interrogation continued for some time with Hoberg asking additional questions and defendant providing responses.

Fenley then reentered the room and asked about Jeanette's injuries:

[THIRD INVOCATION]

"FENLEY:   *** I know you don't want to look at, at

"DEFENDANT:   I don't want to, please don't make me.

"FENLEY:   No, no, no, don't. Let me finish please. I'm not going to ask you to do that. *But I am going to ask you about them just real quick, ok?*

"DEFENDANT:   *I don't want to no more, please, I don't want to.*"

"FENLEY:   *No, there's something I have to *** know.* Um, when you were treating the wounds *** you saw the ones that went clear down to the bone, right?

"DEFENDANT:    Yes.

"FENLEY:    Ok, was that * * * from one of the lashings with the belt?

"DEFENDANT:    It was from the belt, you're right."

(Emphases added.) The interrogation then continued with defendant providing some limited incriminating admissions, such as explaining that she attempted to treat Jeanette's injuries herself.

### b.   Second interrogation

After the first interrogation concluded, Hoberg and Fenley began to leave the room. Defendant then began talking to them as they were leaving. Hoberg returned to the room, and the second interrogation followed with defendant and Hoberg present. In the second interrogation, Hoberg was more confrontational in his tone. He requested additional details about Jeanette's injuries and further asked defendant about her mental state during the abusive acts. Again, defendant generally admitted only to spanking Jeanette. The second interrogation lasted about 10 minutes. Afterwards, detectives walked defendant back to the first room where she waited for them. Detectives then interviewed Richard for approximately one hour.

### c.   Third interrogation

The third interrogation occurred sometime after Hoberg had made the decision to arrest defendant; however, Hoberg had not informed defendant that she was under arrest. The interrogation lasted about 20 to 30 minutes, with Hoberg and Lieutenant Smith present. It was prompted by defendant's request to speak with Hoberg and Smith, indicating that she had something to tell them. In her statements, defendant discussed certain aspects of her abusive behavior. For example, defendant stated that she had lied about striking Jeanette only three times on the buttocks. Defendant then admitted to whipping Jeanette over her back and sides with belts, a sewing yardstick, and sticks from the yard; punching and scratching Jeanette's face; and kicking her "over and over." Defendant was then arrested and transported to the county jail.

d.   Fourth interrogation

The fourth interrogation occurred about six hours after the third interrogation. It lasted about 10 to 20 minutes, with Hoberg and Smith present. At the beginning of the interrogation, defendant was again read her *Miranda* rights. She stated that she understood her rights and had no questions. Like the third interrogation, defendant provided additional incriminating statements about certain aspects of the abuse. For example, she told detectives that she had also whipped Jeanette's chest, legs, feet, and hands; and she had hit Jeanette hard with her hand, which caused Jeanette to fall back into a door and seriously injure her head.

e.   Trial court ruling

In ruling on the admissibility of the evidence, the trial court heard testimony from Hoberg, watched video recordings and reviewed transcripts of the first and second interrogations, and reviewed police reports recounting the third and fourth interrogations. The court concluded, as a matter of law, that defendant was adequately advised of her *Miranda* rights "at all times." It then determined that defendant was under compelling circumstances when she first indicated that she was "done," because, at that point, the tone and content of the conversation had shifted and defendant had unsuccessfully requested to see Richard. The trial court concluded that the conversation had turned from "an informational conversation to one of interrogation." The court further determined that defendant's statements "to the effect that she was done" were equivocal; however, it concluded that defendant continually reinitiated the conversation with detectives and made additional statements without inducement by threats, promises, or coercion. It concluded that all of defendant's statements in the interrogations were voluntary and, thus, admissible at trial.

f.   Analysis

To protect the right against self-incrimination secured by Article I, section 12, and the Fifth Amendment, police are required to give *Miranda* warnings to persons in custody or otherwise compelling circumstances. *Vondehn*, 348 Or at 474; *State v. Roble-Baker*, 340 Or 631, 638, 136 P3d 22 (2006); *Miranda v. Arizona*, 384 US 436, 473-74, 86

S Ct 1602, 16 L Ed 2d 694 (1966).[10] If a person unequivocally invokes her right to remain silent during a custodial interrogation, police must honor that request and stop questioning. *See State v. Davis*, 350 Or 440, 459, 256 P3d 1075 (2011) ("[I]f there is a right to remain silent that is guaranteed by Article I, section 12, it is a right to insist that the police refrain from interrogation after a person who is in custody or otherwise in compelling circumstances has invoked the right to remain silent."); *Miranda*, 384 US at 473-74 ("If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."). However, a person may still waive the right as long as that waiver is knowing, intelligent, and voluntary under the totality of the circumstances. *See State v. Meade*, 327 Or 335, 339-41, 963 P2d 656 (1998) (waiver under Article I, section 12); *State v. Kell*, 303 Or 89, 734 P2d 334 (1987) (same); *Edwards v. Arizona*, 451 US 477, 482, 101 S Ct 1880, 68 L Ed 2d 378 (1981) (waiver under Fifth Amendment).

We begin our analysis with defendant's claim under Article I, section 12, of the Oregon Constitution. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (so holding). As mentioned, the trial court concluded that defendant equivocally had invoked her right to remain silent three times during the first interrogation, but that she then continually waived that right by reinitiating the conversation with detectives. Defendant contends that she did not reinitiate the conversation with detectives. The state responds that the trial court was correct that defendant reinitiated the conversations and, alternatively, claims that defendant's invocations were equivocal such that the detectives were permitted to continue the conversation to clarify whether defendant was exercising her *Miranda* rights.

---

[10] The parties do not dispute that defendant was adequately advised of her *Miranda* rights or that she validly waived those rights at the commencement of the interrogation. Nor do the parties contest that defendant was under compelling circumstances at the time of the invocations highlighted above. We agree with the trial court's legal conclusion that defendant was properly advised of her rights, waived those rights initially, and was under compelling circumstances when she first indicated that she was "done." *See, e.g.*, *Vondehn*, 348 Or at 474 (regarding *Miranda* requirement and ability to waive right to remain silent); *Roble-Baker*, 340 Or at 640-41 (citing nonexclusive list of factors establishing when circumstances are compelling such that *Miranda* warnings are required).

We conclude that defendant unequivocally invoked her right to remain silent during the first interrogation. *See Meade*, 327 Or at 339 ("When a suspect in police custody makes an unequivocal request to talk to a lawyer, all police questioning must cease."); *State v. Charboneau*, 323 Or 38, 54, 913 P2d 308 (1996) (same). Defendant's first and second invocations unambiguously communicated that she no longer desired to talk with detectives. Defendant's third invocation, when viewed in the context in which it was made, effectively communicated her intent to stop the conversation.[11]

We agree with the trial court's conclusion that defendant then reinitiated the conversation with authorities after her first invocation, thus waiving her right to remain silent. *See State v. Singleton*, 288 Or 89, 104, 602 P2d 1059 (1979) ("[T]he question of waiver is not simply a question of historical fact, but one which requires the application of constitutional principles to the facts as found."). After communicating to detectives that she no longer wanted to talk, defendant continued the conversation without prompting from the detectives. Defendant made repeated references to her abuse of her daughter and asked the detectives about their view of the case. Defendant thereby expressed a willingness to continue a discussion about the investigation. *See Meade*, 327 Or at 341 (concluding that the defendant initiated further conversation that evinced a willingness and desire for a generalized discussion about the investigation).

Defendant was advised of her *Miranda* rights at the beginning of the first interrogation, indicated that she understood her rights, and waived them. Defendant's first invocation came approximately one hour later. As defendant continued talking, the detectives repeatedly sought to clarify whether defendant wanted to stop speaking with them. *See Montez*, 309 Or at 572-73 (noting that officers' "neutral questions, intended only to clarify" whether the

---

[11] The state maintains that defendant, in her third invocation, merely expressed a desire not to look at a photograph of Jeanette. The state is mistaken. Before defendant's invocation, Fenley acknowledged that he was aware that defendant did not want to look at anything and assured defendant that he was "not going to ask [her] to do that." He instead told defendant that he still needed to ask her about Jeanette's injuries. When defendant then stated, "I don't want to no more, please, I don't want to," she was communicating that she did not want to talk with Fenley about Jeanette's injuries.

defendant had invoked his right to counsel "did not probe beyond [the] limited and permissible inquiry"). The detectives did not ask investigative questions at that time and offered limited responses to questions that defendant posed to them. Thus, we conclude that defendant knowingly and voluntarily waived her right to remain silent after her first invocation. *See Meade*, 327 Or at 341-42 (concluding that the statements following the defendant's invocation were "the result of free, unconstrained, and informed choice" (internal quotation marks omitted)).

That reasoning, however, does not apply to defendant's subsequent invocations. After defendant's second invocation, Hoberg understood that defendant was exercising her right to remain silent. He therefore stopped the interrogation and left the room. Hoberg waited only one minute before reentering the room and asking the same question that preceded defendant's second invocation. Similarly, defendant's third invocation occurred in response to Fenley's question regarding Jeanette's injuries. Rather than stop the interview, Fenley persisted in questioning defendant about Jeanette's injuries.

Thus, we conclude that the statements defendant made after her second and third invocations were not obtained through defendant's knowing and voluntarily waiver of her right to remain silent, under Article I, section 12, of the Oregon Constitution. We conclude that defendant unequivocally invoked her right to remain silent under Article I, section 12, and the detectives violated defendant's rights when they persisted in questioning her after her second and third invocations. As a result, defendant's statements from the first interrogation that occurred after her second invocation should have been suppressed pretrial and were improperly admitted during the penalty-phase proceeding.

We now consider whether defendant's statements in her subsequent interrogations were obtained in violation of her right to remain silent under either the state or federal constitution. In *State v. Jarnagin*, 351 Or 703, 716-17, 277 P3d 535 (2012), we examined whether a defendant's later decision to speak to officers was a product of an earlier *Miranda* violation. We explained that relevant factors

to consider include the nature of the initial violation, the amount of time between the violation and the defendant's later statements, whether the defendant remained in custody between the violation and the later statements, and whether there was a change in time and circumstances. *Id.*

Turning to the evidence, we note that defendant's second interrogation occurred immediately after the statements that were obtained during the first interrogation. There was no significant temporal break, and the same parties were present in the same room. There was also no significant difference in the quality of the statements elicited. Based on those circumstances, we conclude that defendant's statements in her second interrogation were an extension of the statements illegally obtained during her first interrogation and that they also should have been suppressed pretrial and were improperly admitted during the penalty-phase proceeding.

However, we conclude that the statements defendant made during the third and fourth interrogations were not a product of the earlier illegality. As noted, the detectives stopped questioning defendant for a period of one hour after the second interrogation. Defendant then initiated the third interrogation by stating that she had something to tell Hoberg and Smith. *See Meade*, 327 Or at 340-42; *Edwards*, 451 US at 484-85. She requested to speak with them privately and provided additional admissions about certain aspects of her abusive acts against Jeanette. Many of those statements were qualitatively different from the more limited admissions that she had made previously. *See Jarnagin*, 351 Or at 722 (noting that the defendant had not previously admitted to specific criminal conduct in unwarned interview, so subsequent interview was not a repeat of earlier violation); *Missouri v. Seibert*, 542 US 600, 616-17, 124 S Ct 2601, 159 L Ed 2d 643 (2004) (analyzing same considerations under the federal constitution).

Defendant likewise waived her rights at the initiation of the fourth interrogation. When a person invokes her right to remain silent, police may reinitiate contact after a reasonable time, provide new *Miranda* warnings, and obtain a valid waiver. *See State v. Stilling*, 285 Or 293, 302-03, 590

P2d 1223, *cert den*, 444 US 880 (1979) (so holding); *Michigan v. Mosley*, 423 US 96, 104-06, 96 S Ct 321, 46 L Ed 2d 313 (1975) (same). In this case, the fourth interrogation occurred approximately six hours after the third and after defendant had initiated a discussion in the third interrogation. At that point, Hoberg and Smith again advised defendant of her *Miranda* rights. Defendant acknowledged that she understood them and signed a form to that effect. She answered the detectives' questions and did not again invoke her right to remain silent. Thus, we conclude the statements elicited in the third and fourth interrogations were not obtained in violation of defendant's constitutional rights.

Defendant also claims that the detectives' unconstitutional conduct during the first interrogation created a coercive environment that rendered her subsequent statements involuntary. Under both Article I, section 12, and the Fifth Amendment, a person's statements are voluntary if, under the totality of the circumstances, the person's "'will was not overborne and his capacity for self-determination was not critically impaired.'" *Acremant*, 338 Or at 324 (quoting *State v. Vu*, 307 Or 419, 425, 770 P2d 577 (1989)); *see also Schneckloth v. Bustamonte*, 412 US 218, 225-26, 93 S Ct 2041, 36 L Ed 2d 854 (1973). We review the voluntariness of defendant's statements for errors of law and are bound by the trial court's findings of historical fact if supported by the record. *State v. Terry*, 333 Or 163, 171, 37 P3d 157 (2001), *cert den*, 536 US 910 (2002).

Applying that standard, we reject defendant's contention that the detectives used coercive tactics that rendered defendant's subsequent statements involuntary. The trial court found that defendant's statements were not obtained by threats or promises, and that finding is supported by the record. Additionally, as previously discussed, defendant was given *Miranda* warnings before any statements were obtained, she initiated the third interrogation, and she was given *Miranda* warnings before the fourth interrogation. Her statements in the third and fourth interrogations were also qualitatively different from those that had preceded. Thus, the trial court did not err in concluding that defendant's statements were voluntary.

The remaining question is whether the admission during the penalty phase of the statements improperly obtained during the first and second interrogations was harmless. We begin with the state constitutional standard. Article VII (Amended), section 3, of the Oregon Constitution governs whether an appellate court must affirm a conviction even though a legal error occurred during the trial. *State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003). That provision provides, in part:

> "If the supreme court shall be of opinion, after consideration of all the matters thus submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial[.]"

Or Const, Art VII (Amended), § 3.

In determining whether to affirm a judgment under that constitutional provision, this court reviews the record to decide whether there was "little likelihood" that the error affected the jury's verdict. *Davis*, 336 Or at 32; *see also State v. Lopez-Minjarez*, 350 Or 576, 587, 260 P3d 439 (2011) (concluding "that the erroneous instruction had no significant likelihood of affecting the jury's verdict"). The focus of that inquiry "is on the possible influence of the error on the verdict rendered, not whether this court, sitting as a factfinder, would regard the evidence of guilt as substantial and compelling." *Davis*, 336 Or at 32. In *Davis*, this court concluded that the erroneous exclusion of evidence was harmful. *Davis*, 336 Or at 33-35. The court reasoned that the evidence excluded was integral to the defendant's case and influential because it substantiated the defendant's version of events. *Id.* at 34. The court further reasoned that the evidence was not "duplicative or unhelpful" to the jury and was not cumulative, because the excluded evidence was "qualitatively different than the evidence that the jury heard." *Id.* at 33-34.

Applying those harmless error principles, we conclude, on the particular facts of this case, that the trial court's error in admitting the statements illegally obtained during defendant's first and second interrogations was harmless. As noted, the illegally obtained statements were more limited in

nature than those obtained from the third and fourth interrogations. The illegally obtained statements included only admissions that defendant had "spanked" Jeanette three times with either a belt or stick, had controlled and limited Jeanette's water supply, had cleaned up some evidence of abuse, had caused an injury that had exposed Jeanette's bone, and had attempted to treat Jeanette's injuries herself. Defendant otherwise maintained that Jeanette's additional injuries were caused by Richard or by Jeanette falling down.

In contrast, defendant provided more substantial admissions of certain aspects of the abuse in the third and fourth interrogations. She admitted to repeatedly whipping, hitting, and kicking Jeanette all over her body; and hitting Jeanette so hard that Jeanette fell and seriously injured her head. Those admissions were properly admitted at trial. Moreover, as noted, defendant pleaded guilty before she proceeded to sentencing. In her plea petition, defendant admitted to the "intentional maiming and torturing" of Jeanette. That admission was properly before the jury in its deliberations on whether defendant should receive the death penalty.

In considering the effect of the improperly admitted evidence in light of the admissions that were properly admitted and the guilty plea, we conclude that the jury would have regarded the improperly admitted evidence as duplicative or unhelpful. *See Davis*, 336 Or at 33-34 (relying on the same considerations); *see also State v. Randant*, 341 Or 64, 74, 136 P3d 1113 (2006), *cert den*, 549 US 1227 (2007) (any error in admitting some statements harmless in light of more detailed and prejudicial statements). The evidence did not have a tendency to affect the jury's verdict, and its erroneous admission was harmless.

The same result follows under the Fifth Amendment. Once a person exercises her Fifth Amendment "right to cut off questioning," police must "scrupulously honor" that request and cease the interrogation. *Mosley*, 423 US at 104. A person may knowingly and voluntarily waive the right. *Edwards*, 451 US at 482. However, without a waiver, police violate a person's right if they fail to "honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting

in repeated efforts to wear down his resistance and make him change his mind." *Mosley*, 423 US at 105-06. For the reasons stated above, we conclude that the detectives' conduct after defendant's second and third invocations violated defendant's Fifth Amendment right to remain silent.

Under the Fifth Amendment, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 US 18, 24, 87 S Ct 824, 828, 17 L Ed 2d 705 (1967); *see also Delaware v. Van Ardsdall*, 475 US 673, 684, 106 S Ct 1431, 89 L Ed 2d 674 (1986) (reviewing court must consider the importance of the improperly admitted testimony, whether the testimony was cumulative, the presence or absence of corroborating or contradicting testimony, and the overall strength of the prosecution's case). Under the federal standard, we conclude that admission of the statements in question was harmless beyond a reasonable doubt.

B.   *Dismissal of prospective jurors*

During jury selection, the trial court granted the prosecution's for-cause challenge to prospective jurors Howe, Gonzalez, and Brown. The trial court also dismissed *sua sponte* prospective juror Thurston. In her fourth assignment of error, defendant argues that, in excusing those jurors for cause, the trial court violated her right to an impartial jury.

Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution guarantee the right to an impartial jury during criminal proceedings. To protect that right, the trial court may excuse a prospective juror for actual bias. *See* ORCP 57 D(1)(g); ORS 136.210(1) (making ORCP 57 D(1)(g) applicable to criminal trials). In assessing whether a prospective juror should be excused for actual bias, the question is whether the juror's "'ideas or opinions would impair substantially his or her performance of the duties of a juror to decide the case fairly and impartially on the evidence presented in court.'" *State v. Fanus*, 336 Or 63, 83, 79 P3d 847 (2003), *cert den*, 541 US 1075 (2004) (quoting *State v. Barone*, 328 Or 68, 74, 969 P2d 1013 (1998), *cert den*, 528 US 1135 (2000)); *see also* ORCP 57 D(1)(g); *Wainwright v. Witt*, 469 US 412, 424,

105 S Ct 844, 83 L Ed 2d 841 (1985) (stating essentially the same standard). The trial court must look to "the totality of the potential juror's *voir dire* testimony to discern whether it suggests the probability of bias." *State v. Lotches*, 331 Or 455, 474, 17 P3d 1045 (2000), *cert den*, 534 US 833 (2001) (internal quotation marks omitted). As we have explained, "it is not enough that a prospective juror believes that he can be fair and impartial. The trial court * * * must find from all the facts that the juror will be impartial and fair and not be consciously or unconsciously biased." *Montez*, 309 Or at 575.

A prospective juror's "approval of or opposition to the death penalty alone is not determinative of whether the juror may serve as a juror or must be excused." *Montez*, 309 Or at 575; *State v. Nefstad*, 309 Or 523, 536, 789 P2d 1326 (1990) (same); *Witt*, 469 US at 424 (stating similar rule). As the United States Supreme Court explained in *Adams v. Texas*, 448 US 38, 50, 100 S Ct 2521, 65 L Ed 2d 581 (1980), "to exclude all jurors who would be in the slightest way affected by the prospect of the death penalty or by their views about such a penalty would be to deprive the defendant of the impartial jury to which he or she is entitled under the law." However, a juror may be excused if the juror indicates that he or she cannot put aside personal views and decide the case impartially and in accordance with the law. In *Nefstad*, this court affirmed the excusal of a prospective juror who expressed opposition for the death penalty when the juror indicated that he could not vote for the penalty. 309 Or at 536-38.

We review the trial court's decisions excusing jurors for abuse of discretion. *Montez*, 309 Or at 575; *see also Lotches*, 331 Or at 473-74 (actual bias is a factual question to be determined by trial court). "Because the trial court has the advantage of observing a challenged prospective juror's demeanor, apparent intelligence, and candor," we accord great deference to the trial court's judgment as to the prospective juror's qualifications. *State v. Compton*, 333 Or 274, 285, 39 P3d 833, *cert den*, 537 US 841 (2002); *Montez*, 309 Or at 575. "We give greatest deference to the trial court when a juror's answers are contradictory or unclear." *Compton*, 333 Or at 286; *see also Nefstad*, 309 Or at 537-38; *Witt*, 469 US at 429 (noting that the "predominant function" of trial judge in

determining juror bias "involves credibility findings whose basis cannot be easily discerned from an appellate record"). We now review each excusal.

1.   *Prospective juror Howe*

After defendant questioned and passed prospective juror Howe, the prosecutor asked:

"Q.   * * * Do you think you could decide whether or not this living, breathing human being deserves to die for the crime she committed?

"A.   Probably, yeah.

"Q.   And I ask you that because I notice there was a lot of 'I don't know' or 'I don't understand,' you know, responses to some of these questions [in the juror questionnaire]—

"A.   Yeah.

"Q.   —and so I—we need to take some time to figure out what is it you're thinking about when you say you don't understand. What comes to mind? You haven't really elaborated on any of that with regard to the death penalty.

"A.   There w[ere] a few questions on there that I didn't really understand—

"Q.   Yeah.

"* * * * *

"Q.   Ms. Howe, I'm looking at page 7 [of the juror questionnaire]. I'll give you a chance to get there. And I'm looking at (d) there. It's basically asking you about, you know, religious, moral or just even philosophical, you know, really, objections to the death penalty. And you said there you didn't understand. Do you understand the question or—

"A.   Um, yeah, the question.

"* * * * *

"Q.   All right. And so that's sort of what the question's getting at there. You know, if you have beliefs maybe religious or otherwise that would actually, you know, prohibit you from making this kind of decision?

"A.   Yeah.

"Q.   Can you expand on that? Do you have any such beliefs?

"A.   I'm not sure. I don't think so.

"Q.   And what would happen if you ended up sitting on the jury is you'd be posed, essentially, with four questions; and three of those would be highly factually driven, and the fourth is a discretionary one, and it would be: 'Do you think the defendant should receive the death penalty?' And again, I want to—would you be able to personally make that decision?

"A.   Yeah.

"Q.   Why? What would you be looking for? What kind of evidence?

"A.   I'm not sure. I mean, it would have to be pretty good evidence to decide that. I don't know. I mean—

"Q.   That's what I'm getting at. Do you know you could do this or are you still unsure?

"A.   I'm still pretty unsure.

"Q.   And it's okay. You're in a tough spot and there's no right or wrong answer. This is just the time that we would need to find that out now rather than later—

"A.   Yeah.

"Q.   —if you could do that. And so, again, you know, if charged with the responsibility of deciding, are you just unsure if you'd be able to consider death penalty for this defendant?

"A.   Yeah, I'm pretty unsure."

The prosecutor then asked that Howe be removed for cause.

On defense counsel's attempt to rehabilitate Howe, the following exchange occurred:

"Q.   It's a tough position. I hope we're not picking on you at all. I appreciate your being honest about it. But you did say in the questionnaire that you do—you do believe in the death penalty?

"A.   Yeah.

"Q.   Is that correct?

"A.   Yeah.

"Q.   And it's one of the three [possible sentences] you would consider?

"A.  Yeah.

"Q.  But it wouldn't be easy to make that vote?

"A.  Yeah.

"Q.  But could you make that vote if the facts came in—

"A.  Yeah.

"Q.   —and the instructions came in and you decided in your mind and conscious [*sic*] that that's the decision that has to be made?

"A.  Yeah.

"Q.  But you also would consider the other two [sentencing options] and might impose any of the three [sentencing options], correct?

"A.  Yeah."

Defense counsel then objected to the excusal of juror Howe. The trial court granted the state's motion and excused Howe.

Defendant argues that Howe's statements generally demonstrated a willingness to consider the evidence notwithstanding her hesitancy about questions relating to the death penalty. We agree that neither Howe's indication that it would be difficult to vote to put a person to death or her statement that, to garner her vote, the evidence would have to be "pretty good," constituted sufficient reason to exclude her for actual bias. The decision that Howe and other jurors were asked to make was indeed difficult, and the jury is required to base its sentencing decision on the evidence presented. The fact that Howe stated, at the outset of the case, that to support a sentence of death, evidence would have to be "pretty good" was not an indication that Howe would not be able to make her sentencing decision fairly and impartially.

That does not mean, however, that the trial court erred in excluding Howe. The state challenged Howe for "cause," and a trial court permissibly may grant such a motion for reasons other than actual bias. *See* ORCP 57 D(1)(a), (b) (challenges for cause); ORS 136.210(1) (applying ORCP 57 D(1)(a) and (b) to criminal cases). Howe expressed confusion and a lack of comprehension with respect to a

number of questions appearing on the juror questionnaire and in response to questions directed to her during *voir dire*. In addition, Howe said that she was unsure whether she could make the sentencing decision that she would be required to make. The trial court could have understood Howe's response as an indication that she did not have the ability to make any sentencing decision, rather than as an indication that she was biased in favor or against any particular sentencing decision.

We have carefully reviewed the *voir dire* of all of the jurors in this case and are satisfied that the trial court correctly considered whether the jurors exhibited actual bias that would impair their ability to make the sentencing decision fairly and impartially. The record demonstrates that a number of jurors stated that the sentencing decision would be difficult or that the evidence indicating that death should be imposed would have to be persuasive, but who, nevertheless, remained on the jury panel after challenges for cause were taken. In fact, in one instance, a juror stated, in response to questions by the prosecutor, that it would be "hard to imagine anything heinous enough that you would have to vote for the death penalty. It's hard." Nevertheless, the court denied the state's challenge for cause. That juror was different from Howe, however, in that she exhibited a strong ability to understand the complex issues presented and to follow the court's instructions.

We conclude that the trial court was in a position to assess Howe's demeanor and qualifications and did not abuse its discretion in excluding her for cause other than actual bias.

2. *Prospective juror Gonzalez*

During defense questioning, prospective juror Gonzalez agreed that the death penalty may be proper in some cases, but stated that she would want to know "the why's and why not's." After the defense passed Gonzalez, the prosecutor asked her the following:

"Q.   Ms. Gonzalez, I notice in a lot of your answers, you make reference to counseling, you know, getting help for people. What does that mean to you when you think about a death penalty case? What are you thinking?

"A.   Well, there's a reason why it happened, and some-
times by going to counseling or seeing somebody to talk
about why, there's a reason behind that. And something
could have happened in their past or in their situation. And
so—and only that person that they talk with is going to
know that.

"Q.   Hypothetically speaking, let's say you do get that
sort of information, why are you looking for that sort of
information? Does that somehow reduce culpability in your
mind?

"A.   Maybe. Maybe to justify it, maybe, in my mind.

"Q.   And conversely, what if you never hear why the
defendant killed her daughter? You learn about what hap-
pened, but you're never really satisfied about why or maybe
the psychological or—

"A.   I don't know. I would probably ask myself ques-
tions, I guess.

"Q.   Would that impair your ability to decide whether
her crime deserved the death penalty?

"A.   I'm not sure.

"Q.   If that itch was never scratched, you know, could
you bear the responsibility of deciding whether the crime
itself deserved—

"A.   Probably not.

"Q.   And so then you wouldn't, of course, be able to con-
sider the death penalty.

"A.   Correct."

The prosecutor moved that Gonzalez be removed for cause.

Defense counsel then attempted to rehabilitate
Gonzalez. On defense questioning, Gonzalez agreed that she
was not categorically against the death penalty and would
keep "an open mind." Defense counsel then informed the
court that the defense opposed the excusal of Gonzalez. The
court provided a brief explanation of the death penalty sen-
tencing process, after which the prosecutor resumed with
the following questioning:

"Q.   And with regard to that, as the Court's told you,
you are not—you know, it's not required that you hear why.

You may never hear why and it's not one of the [four questions required to impose the death penalty]. And I'll just restate my question. Then knowing that you'd have a possibility of, you know, [imposing a sentence of] life without parole after 30 years, would there be any circumstance under which you would consider whether the death penalty is appropriate?

"A.   I can't—I don't know.

"Q.   You had answered no before, and was there something that changed?

"A.   (No response.)

"Q.   There's no right or wrong answer.

"A.   I really can't—I don't know. I can't say. I'm sorry. I don't know the answer to that question.

"Q.   Okay."

The court then asked a question:

"COURT:   And it's difficult. I mean I can't imagine in any other place or any other moment in somebody's life is there a discussion that takes place like this. We're asking something very serious. One way to put it, thinking about this now, do you either favor or rule out any of the three [sentencing] options?

"A.   I don't favor them and I don't rule them out."

The prosecutor renewed the challenge, arguing that "the answer 'I don't know' still doesn't quite get us to what the juror would be required to do if she were to sit on the jury." The trial court then excused Gonzalez for cause.

Defendant asserts that Gonzalez's statement that she would keep an open mind and consider all three sentencing possibilities demonstrated her qualifications, and that her difficulty with imposing the death penalty if the question "why the defendant killed her daughter" was not answered was merely Gonzalez's acknowledgement of the gravity of the death penalty decision. That is one way of looking at the *voir dire*. However, our review of the transcript indicates that the trial court took great pains to outline for Gonzalez the four questions that the jurors would be required to answer and, immediately after having heard

that explanation, Gonzalez answered the question, "would there be any circumstances under which you would consider whether the death penalty is appropriate?" by saying "I can't—I don't know." The trial court may well have concluded that Gonzalez was unable to make the weighty decision that would be required in a death penalty case and not that she was actually biased against or in favor of defendant or the state.

Defendant alternatively suggests that the prosecutor's question asking whether Gonzalez would need to know "why" defendant killed her daughter was improper for two reasons. First, defendant contends that the prosecutor's question–essentially asked Gonzalez to comment in advance how she would react to certain evidence. Defendant equates the "why" question here to the "improper" question posed in *Montez* where the prosecutor asked whether specific pieces of evidence—*e.g.*, the victim being "hog-tied," "sexually abused," "strangled," and "burned"—would make the prospective juror "angry." 309 Or at 592. Second, defendant argues that the "why" question impermissibly asked Gonzalez to positively state whether she would vote for the death penalty. Defendant submits that the United States Supreme Court rejected that type of questioning in *Adams*, which held it improper to exclude jurors who "were unable positively to state whether or not their deliberations would in any way be affected" by the possibility of the death penalty. 448 US at 50 (internal quotation marks omitted).

The state responds that the prosecutor permissibly asked the "why" question because it tended to expose the risk that Gonzalez would not follow the court's instructions if defendant's motives were not explained at trial. In the state's view, the "why" question at issue here is different from positing specific evidence and asking a juror to prejudge the case, which this court found improper in *Montez*.

We do not think that the prosecutor's question about a potential lack of evidence regarding defendant's motive is improper. Unlike *Montez*, the question did not "ask[] the juror to comment in advance on how [she] would react to specific evidence." *Montez*, 309 Or at 584. Rather, it generally referred to the potential lack of evidence relating to

defendant's motive. The question was also unlike that posed in *Adams* because it did not tend to suggest that the possibility of the death penalty itself would affect Gonzalez's deliberations. We therefore conclude that the trial court's decision to excuse Gonzalez fell within the proper exercise of its discretion. *Montez*, 309 Or at 574-75.

   3.   *Prospective juror Brown*

        After defendant questioned and passed prospective juror Brown, the prosecutor asked:

   "Q.   Mr. Brown, before anybody here at counsel table had a chance to talk to you, it looks [from your questionnaire] like you actually strongly disagree with the death penalty. Even if the facts and laws justify it, you disagree. Before any lawyers talked to you.

   "A.   I may disagree, but like I stated in my questionnaire, I believe in the rule of law. If I felt that strongly about it I would protest against it until the law changed. I really haven't done that. So I do feel that there are extenuating circumstances which would call for the death penalty and be justified.

   "Q.   You mentioned it. It must be the only course of action remaining. And of course that's not the case. There are three [sentencing] options.

   "A.   Yes.

   "* * * * *

   "Q.   —would you look for the other options.

   "A.   Well, I think that what I feel as a person in society is one of the things I've used to measure the decision. The next step is what happens after the court is done. What happens to the defendant? What happens to how she integrates into society and how she should live in society? What her intentions are that she has to society and those that would be affected. I think that the knowledge just isn't in here. This is a continuing—

   "Q.   Understood.

   "* * * * *

   "Q.   There are two other [sentencing] options, though.

   "A.   Yes.

"Q. Based on what you're telling me it doesn't look like to me as though you'd ever consider the death penalty, because you wouldn't have to.

"A. That is true. But this is an issue I would have to consider. But if the other 11 jurors are strongly in favor of [the death penalty], I would have to take a moment to understand why is it I might be coming from a different perspective. And then I would do my job to either understand what they're saying and why they feel that way or to give it some more thought. But with that said, I have not heard the specifics of the case. And when I say it must be the only option and it must be the only option that is efficient. The only option that is expedient.

"* * * * *

"Q. What if one of the questions is * * * should the defendant receive the death penalty, not the cause-and-effect analysis, or what if you're not given any of that information. You just have to decide based on what she did, whether she should die. Could you do it?

"A. I certainly could. But I'm not going to give you a statement right now.

"Q. It's something that is certainly important for all of us up here to know before you be chosen as a juror whether or not you would be able to make that decision.

"A. Yes. I understand. Like I said, if a person presents a clear and present threat to society, there's no way that she could be rehabilitated, there's—it's so grievous a crime that no one—she can't be suffered to live, I would say yes.

"Q. Can you think of such a crime?

"A. If I were to say I would never choose the death penalty as an option, I would have stated that. I'm leaving the chance open for that to be a possibility. I'm leaving the chance open for that decision to be made. But it is true that I'm strongly slanted against the death penalty for the reasons I have stated.

"Q. Do you think the State would have a fairly uphill battle to overcome your personal bias?

"A. I think that's fair to say."

At that point, the court explained that neither cost nor efficiency were "a legal basis" for deciding whether to

impose the death penalty. The prosecution resumed with the following questions:

"Q.   With regard to that fourth question, whether or not the defendant should receive the death penalty, given the other options, would there ever be a reason you would decide the death penalty?

"A.   I can't state for sure in this case to answer the specifics, but again, if the crime was so grievous that there was no—it seemed like the only solution was the death penalty, I can see that situation occurring. I'm not going to wallow in some type of fantasy to try and describe how that might occur. Again, I'm not so closed to the death penalty that I would say it's not an option.

"Q.   And your strong bias, do you feel that that would at least impair—would that be a better word—your ability? Would that be more fair to say?

"A.   I would say that just as much as you are fighting—if that's what I'm hearing, that you are fighting for the death penalty, then I would say just as much that I am fighting to have justice served that would probably not include the death penalty."

The prosecutor then moved to excuse Brown for cause.

The defense attempted to rehabilitate Brown:

"Q.   And we've been back and forth and I don't want to pick on you any longer, but can you sit on the jury, take an oath, and consider all three as possible sentences after you've heard the evidence, of course?

"A.   Well, I think what seems to be—there is no legal guidance on what the penalty should be. And I think a person must have some sort of framework with which to decide what is appropriate. And what I'm being clear to you is that my framework put the death penalty below the time in prison, or the other two [possible sentences], basically. That's all I'm saying.

"Q.   But that doesn't eliminate it from your considered decision?

"A.   Not at all.

"Q.   All right."

The trial court ultimately excused Brown for cause.

Defendant argues that Brown expressed an ability and a willingness to follow the court's instructions and consider all potential sentences, notwithstanding his disapproval of the death penalty. Defendant contends that Brown's statements reflect the gravity with which jurors properly should treat such a decision. However, just before Brown was examined, the court had granted, over the state's objection, defendant's motion to exclude a juror who had said that she was "for [the] child" and that defendant would have a huge uphill battle getting her to impose a penalty other than death. After the court's ruling, the state asked to speak with the court. The state pointed out its understanding that, "even if a juror is leaning toward one result or another, that doesn't necessarily disqualify them," as long as the juror agrees that the juror will consider all the options, and that that standard "cuts both ways." The court responded by explaining why its practice was to retain some but not all jurors who agree that they will consider all of the sentencing options. The court said that, when jurors come into the evidentiary process with an expressed position on one option or another, the court was inclined to accept that as "a very accurate and sincere statement of how they look at the case," and that, although there could be "wrestling" to get jurors to commit to being fair and impartial, "moving them semantically" did not necessarily give the court an accurate view of the jurors' beliefs. The court stated, to be blunt, "the idea that somebody who expresses an opinion one way or the other can sort of be talked back to the middle I don't find it particularly helpful unless it is clear to me that their first statement of how they feel or their initial statements or their explanation somehow did not correctly reflect how they feel" about imposing the death penalty.

That is the case with Brown. He stated on the juror questionnaire that he filled out before coming to court that he "strongly disagreed" with the death penalty. Although on questioning Brown stated that he would consider sentencing defendant to death, he also said that he would "fight" to "have justice served that would probably not include the death penalty." The trial court did not err in deciding that Brown's opinions would substantially impair his ability to decide the case fairly and impartially. The trial court treated Brown's

statements that he would consider imposing the death penalty in the same way it had treated the statements of the prior juror who stated that she would consider imposing a sentence other than death—that is, as statements that did not accurately reflect Brown's true feelings. In the circumstance in which a juror expresses such a strong opinion for or against the death penalty as did Brown, the trial court acts within its discretion in declining to credit the juror's commitment to impartiality.

   4.   *Prospective juror Thurston*

        During defense questioning, defense counsel asked prospective juror Thurston about comments that he made in his juror questionnaire. The following exchange occurred:

   "Q.   I'm going to—you know, you did this questionnaire for us and we thank you for it.

   "A.   Un-huh.

   "Q.   It gives us a lot of things to talk about. But I'm going to jump through [to] the portion about the death penalty because you made some fairly strong comments there.

   "A.   Yes.

   "Q.   [Defendant] is on trial for her life—

   "A.   I understand.

   "Q.   —and she is entitled to have objective, fair jurors, as the State is—

   "A.   Un-huh.

   "Q.   —and they're going to have to go in the jury room now that she's pled guilty and not decide she's guilty or not, just decide if she's going to live or not.

   "A.   Exactly.

   "Q.   Can you go to that jury room and keep an open mind on those three possible [sentencing] verdicts, the life with a chance of parole after 30 [years], life with no chance of ever being paroled, or the death penalty?

   "A.   No, I cannot.

   "Q.   And I think I read a little bit, but can you tell me how you feel?

"A.   Well, it goes beyond religion and spiritual things. Ever since I can remember, um, I hate to add fuel to the flames, but I grew up in Oakland, California, and unfortunately, some aspects of what you hear are true. Not to the degree that you hear—things are blown way out of proportion but, of course, I've had friends that died. I've lived in a neighborhood where you hear gunshots at night. Even at the youngest point, there was something inside me that said I do what I can for my country, but I can't be a soldier because there's something in me that cannot take a life. \* \* \* I would lose a part of myself. And if any way, shape, or form possible that I would not have to do that, I would not. I have a hard time—I do understand the concept. I do understand the whole capital punishment situation. However, people who are on trial for murders have their reasons for murdering and as a general rule, no matter what the reasoning, the State or the federal government always says, 'You cannot do this. You are not allowed to do this.' But then again, we have our reasons and we say it's okay to do it when it comes to capital punishment. That, to me, just doesn't make sense."

As defense counsel began asking another question, the trial court interrupted, stating, "I think Mr. Thurston has articulated how he feels about these issues, and I'm not sure how much more inquiry is going to be of value in this process." The court then excused Thurston *sua sponte*. Defendant did not object or request to ask any additional questions of Thurston.

Although Thurston expressed a strong view against imposing the death penalty, defendant contends that the trial court erred in cutting off defense counsel's inquiry and *sua sponte* excusing him. Defendant cites *Morgan v. Illinois*, 504 US 719, 736-39, 112 S Ct 2222, 119 L Ed 2d 492 (1992), in support of her position that she was entitled to rehabilitate Thurston. However, *Morgan* is inapposite. In *Morgan*, the trial court conducted *voir dire* and denied the defendant's specific request to ask prospective jurors about their ability to give fair consideration to mitigation evidence. Here, defendant did not object or specifically request to ask additional questions. Defendant does not explain how the trial court's decision to cut off defense counsel's inquiry of Thurston prejudiced her when she did not object or request to ask further

questions of him. Further, nothing in the record suggests that defendant could have rehabilitated Thurston. To the contrary, Thurston stated that his inability to impose the death penalty "goes beyond religion and spiritual things" to his personal experience of having friends that died when he was young. He stated that,

> "[e]ven at the youngest point, there was something inside me that said I do what I can for my country, but I can't be a soldier because there's something in me that cannot take a life. *** I would lose a part of myself. And if any way, shape, or form possible that I would not have to do that, I would not."

On this record, we conclude that the trial court did not err in excusing Thurston *sua sponte* when defendant did not object to the excusal or request to ask further questions. *See also Nefstad*, 309 Or at 536-38 (excusal affirmed when juror stated that he could not vote for the death penalty).

C.  *Future dangerousness*

After presentation of the evidence in a penalty-phase trial, the trial court submits four sentencing questions to the jury. *See* ORS 163.150(1)(b) (specifying questions). In her tenth assignment of error, defendant challenges the trial court's denial of her motion for a judgment of acquittal on the second sentencing question, which required the jury to assess whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." ORS 163.150(1)(b)(B).

In reviewing a denial of a motion for judgment of acquittal, this court considers whether a rational trier of fact could have found, beyond a reasonable doubt, a probability that the defendant would commit future criminal acts of violence. *State v. McDonnell*, 343 Or 557, 579, 176 P3d 1236 (2007), *cert den*, 555 US 904 (2008); *see also State v. Longo*, 341 Or 580, 604, 148 P3d 892 (2006), *cert den*, 552 US 835 (2007) (noting that jury must find probability of future violence beyond a reasonable doubt) (citing ORS 163.150(1)(d)); *State v. Moore*, 324 Or 396, 431-33, 927 P2d 1073 (1996) (noting that rational juror standard applies to review challenge to jury findings under ORS 163.150(1)(b)).

In so doing, we view the facts in a light most favorable to the state and draw all reasonable inferences in the state's favor. *State v. Lupoli*, 348 Or 346, 366, 234 P3d 117 (2010).

Defendant contends that the state failed to establish beyond a reasonable doubt a probability that she will commit future criminal acts that constitute a continuing threat to society. First, defendant argues that the only evidence of any "criminal acts of violence" admitted at trial directly relate to her aggravated murder conviction—*i.e.*, her past acts of abuse that culminated in Jeanette's death. Defendant submits that the state cannot establish her propensity for committing future criminal acts of violence based solely on the acts underlying her aggravated murder conviction because it would render the statutory question of future dangerousness superfluous. *See, e.g.*, *Cloutier*, 351 Or at 98 (we will construe a statute with multiple parts in a way that gives effect to all parts). Without the evidence of defendant's past abuse of her daughter, defendant contends that the record was limited to evidence that (1) she lacks a criminal record of committing violent acts; (2) she did not abuse her other children living in the home at that time; (3) she did not engage in significant criminal activity while incarcerated; and (4) she did not suffer from any diagnosed psychological or character condition that indicated a general propensity for violence.

Defendant's argument fails in light of the factual record in this case. As we have previously explained, the question posed in ORS 163.150(1)(b)(B), commonly known as the "future dangerousness" question, "makes relevant any evidence that is probative of whether a defendant is likely to engage in dangerous, criminal conduct in the future." *Moore*, 324 Or at 415; *see also Longo*, 341 Or at 604 (noting that "probability" as used in ORS 163.150(1)(b)(B) means "more likely than not"). This court has consistently interpreted the future dangerousness question as permitting consideration of a broad range of evidence during penalty-phase proceedings. That evidence includes, but is not limited to, evidence of a defendant's "entire previous criminal history," a defendant's "unadjudicated bad acts," and "evidence of a defendant's previous bad character." *See Moore*, 324 Or at 416 (internal quotation marks, citations, and emphasis omitted).

We have also stated that such evidence may include consideration of the extreme "brutality" by which the defendant committed a crime. *State v. Barone*, 329 Or 210, 244-45, 986 P2d 5 (1999), *cert den*, 528 US 1086 (2000).

Defendant's reading of the evidentiary record is too narrow. Before her two youngest children were born, defendant lost custody of Jeanette and her two eldest sons due to defendant's drug use, neglect, and physical abuse. Her two eldest sons refused to return to her care. There was testimony that defendant abused Jeanette shortly after she regained custody of her, which occurred several years before the family moved to Oregon. Once the family moved to Oregon, the evidence showed that defendant began isolating Jeanette for more severe abuse and physically assaulted Richard. The testimony recounting defendant's demeanor after Jeanette's death suggested a lack of empathy for the prolonged suffering that Jeanette endured. The state further submitted evidence showing that defendant had attempted to manipulate jail staff while incarcerated and awaiting trial.

The evidence also showed that, over the course of many months, defendant punched and kicked Jeanette all over her body, causing bruising and cuts and sometimes knocking out her teeth. Defendant increasingly isolated Jeanette and tortured her for months before her death. Although Jeanette suffered a significant blow to her head shortly before she died, the cause of death was listed as "multifactoral abuse and neglect." Given the severity of Jeanette's prolonged starvation, dehydration, physical injuries and localized infections, authorities were unable to pinpoint a single cause of death.

Thus, the evidence of defendant's pattern of conduct leading up to Jeanette's death showed the targeting and isolation of a vulnerable victim over an extensive period of time coupled with numerous acts of brutal violence. That evidence was sufficient to permit an inference beyond a reasonable doubt that it was probable that defendant would commit future criminal acts of violence.

Second, defendant argues that, even considering the violent acts against Jeanette and other family members, the state failed to establish beyond a reasonable doubt that

she would commit criminal acts of violence that would constitute a continuing threat to society. In particular, defendant argues that her violent acts were directed toward only a sole victim or, at most, her family members. In other words, defendant views her prior behavior as involving only a limited, narrow class of "criminal acts of violence." She contends that the state failed to show that she would be able to control or isolate any person in a similar fashion while imprisoned with other adults. She also notes that, even if she were eventually released from prison, her surviving children would be grown and her ability to procreate would be unlikely. She argues that the jury could not reasonably conclude that she would likely commit violent criminal acts that would pose a continuing threat to society in the future.

This court has not determined that the type or class of victims—*i.e.*, a child or family members—necessarily places a limitation on an assessment of future dangerousness. ORS 163.150(1)(b)(B), as noted, asks a jury to assess whether "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." The text of the statute is written in broad terms. It does not place a limitation on the type of violent criminal acts that a jury may consider, nor does it require a jury to relate a defendant's potential to commit criminal acts to a particular subset of society.

To the contrary, in assessing future dangerousness, this court has held that "threat to society" as used in the statute contemplates "the threat to all of society, no matter whether the universe of that society be great or small." *State v. Douglas*, 310 Or 438, 450, 800 P2d 288 (1990) (internal quotation marks omitted); *see also State v. Farrar*, 309 Or 132, 175-76, 786 P2d 161, *cert den*, 498 US 879 (1990) (noting that future dangerousness applies to everyone). As a result of that broad meaning of "society," "the task of the jury is to consider, not *where* the defendant would be dangerous, but *whether* the defendant would be dangerous." *Douglas*, 310 Or at 450 (emphasis in original).

The evidence in the record shows that defendant engaged in a prolonged pattern of torture and abuse against a vulnerable victim. In the process, defendant engaged

in domineering and manipulative behaviors to isolate Jeanette and family members. While incarcerated, defendant attempted to manipulate jail staff. From that evidence, the jury could have reasonably inferred that defendant would, with sufficient probability, target, control, and dominate other individuals and commit criminal acts of violence against them. The jury could have reasonably found it probable that defendant would commit criminal acts of violence that would constitute a continuing threat to society. *See Moore*, 324 Or at 419 (prior incidents of violence directed against racial minority students "tended to show that defendant might engage in dangerous, criminal conduct in the future").

D.   *Proposed jury instructions*

Defendant submitted proposed jury instructions on the issue of mercy. In her seventeenth assignment of error, defendant asserts that the trial court erred in failing to give those proposed instructions.

A party is generally entitled to a jury instruction if the facts of the case warrant the instruction and the instruction is a correct statement of the law. *State v. Washington*, 355 Or 612, 653, 330 P3d 596 (2014) (citing *State v. McBride*, 287 Or 315, 319, 599 P2d 449 (1979)). A trial court does not err in declining to give an instruction if the instruction is not legally correct. *Id*. This court "review[s] a trial court's refusal to give a requested jury instruction for errors of law." *State v. Reyes-Camarena*, 330 Or 431, 441, 7 P3d 522 (2000).

Defendant proposed the following mercy instruction:

### "MERCY

"The law recognizes and authorizes that any individual juror may base the decision to impose a sentence less than death on mercy alone.

"A juror is also authorized to consider feelings of mercy that flow from the evidence. The law provides that mercy alone is sufficient to support a life imprisonment verdict for any juror.

"Each of you as jurors has the individual authority to extend [defendant] mercy for any reason whatsoever."

(Boldface in original.) In her supporting memorandum, defendant clarified that her requested instruction comprised two instructions to be given in the alternative. Specifically, she requested that the trial court give "one of the following instruction[s] or one of a similar nature":

> "**MERCY (Alternative 1)**
>
> "The law recognizes and authorizes that any individual juror may base the decision to impose a sentence less than death on mercy alone.
>
> "**MERCY (Alternative 2)**
>
> "A juror is also authorized to consider feelings of mercy that flow from the evidence. The law provides that mercy alone is sufficient to support a life imprisonment verdict for any juror."

(Boldface in original.) The trial court declined to give either instruction.

On review, defendant contends that her proposed alternative mercy instructions constitute correct statements of the law not adequately covered by the instructions given during her penalty trial. She submits that this court and the United States Supreme Court have recognized that a jury's decision to afford an individual defendant mercy does not violate the state or federal constitution.

In *Washington*, this court reviewed and rejected essentially the same challenge to a proposed mercy instruction. The defendant's proposed instruction in that case would have instructed the jury that it could base its decision whether to impose the death penalty "on mercy 'alone' and 'for any reason whatsoever.'" *Washington*, 355 Or at 655. We explained that this court has generally rejected that form of instruction because it fails to inform jurors that their decision must be based on the evidence before them. *Id.* at 654; *see also Moore*, 324 Or 396 at 428 (explaining that "any instruction that appeals to the jurors' sympathies also must instruct the jurors that such sympathy must be based upon the mitigating evidence before them"); *State v. Moen*, 309 Or 45, 92, 786 P2d 111 (1990) (affirming instruction that correctly conveyed that "general sympathy, or any emotionalism, has no place in a capital sentencing decision, just as

it has no place in the jury's deliberations during the guilt phase").

We further observed in *Washington* that the federal constitution imposes a similar standard. Specifically, we noted that, in *California v. Brown*, 479 US 538, 107 S Ct 837, 93 L Ed 2d 934 (1987), the United States Supreme Court

"addressed whether an instruction that jurors must not be swayed by 'mere *** sympathy' in the penalty phase of a capital case violated the defendant's rights under the Eighth and Fourteenth Amendments. Holding that it did not, the Court emphasized that the key was not the meaning of the word 'sympathy,' but the fact that the instruction properly cautioned the jury to base its decision only on the evidence before it. *Id.* at 541. In the Court's view, the instruction properly 'limit[ed] the jury's sentencing considerations to record evidence' and, in so doing, 'ensure[d] the availability of meaningful judicial review' of the jury's decision. *Id.* at 543."

*Washington*, 355 Or at 655. Applying those principles to the defendant's proposed mercy instruction, we concluded that the instruction would have incorrectly informed the jury that it could base its decision on "mercy alone" without considering other evidence in the record. *Id.*

Defendant's proposed instructions in this case are similarly flawed. Her first alternative instruction would have informed the jury that it could base its decision "on mercy alone." Although defendant's second alternative instruction would have informed the jury that it could "consider feelings of mercy that flow from the evidence," it then stated that the ultimate decision may be based on "mercy alone." Thus, the instructions did not reflect a correct statement of the law. Accordingly, we conclude that defendant's proposed mercy instructions did not correctly state the law, and the trial court did not err in refusing to give either instruction.

E. *Denial of Motion to Bar Application Of Death Penalty and Alternative Demurrer*

Before trial, defendant filed a "Motion to Bar Potential of Death Penalty or in the alternative, Demurrer," in which she presented several arguments challenging the

indictment and the legality of Oregon's death penalty. The trial court denied defendant's motion and alternative demurrer. In her eighteenth assignment of error on review, defendant argues that the trial court erred in doing so. In bringing her challenge, defendant submits several arguments for this court's consideration. Only one of those arguments merits discussion.[12]

Defendant argues that the indictment fails to state the crime of aggravated murder by abuse, ORS 163.115(1)(c). Count 1 of the indictment charged defendant with aggravated murder as follows:

"The defendant, on or about December 9, 2009, in Lane County, Oregon, without legal justification or excuse, and under circumstances manifesting extreme indifference to the value of human life, did unlawfully and recklessly cause the death, by neglect and maltreatment, of Jeanette Marie Maples, born August 9, 1994, a dependent person, in the course of and as a result of intentional maiming and torture of the victim; contrary to statute and against the peace and dignity of the State of Oregon[.]"

Criminal homicide constitutes murder "[b]y abuse" when a person causes the death of a child who is "under 14 years of age or a dependent person," and the death is caused "by neglect or maltreatment." ORS 163.115(1)(c). A "dependent person" as used in the statute means "a person who because of either age or a physical or mental disability is dependent upon another to provide for the person's physical needs." ORS 163.205(2)(b). The crime of murder by abuse is elevated to aggravated murder when "[t]he homicide occurred in the course of or as a result of intentional maiming or torture of the victim." ORS 163.095(1)(e)

First, defendant contends that the indictment fails to state the crime of aggravated murder by abuse. Defendant notes that, because Jeanette was 15 years old at the time of her death, the state could not pursue a theory of aggravated murder by abuse "of a child under 14 years of age."

---

[12] The state renews its argument that the scope of review limitations imposed under ORS 138.050 and ORS 138.222 preclude this court's ability to review defendant's challenge to the pretrial ruling on her demurrer to the indictment. For the reasons explained above, we conclude that ORS 138.012(1) permits this court to review defendant's challenge.

ORS 163.115(1)(c); ORS 163.095(1)(e). Second, defendant contends that the state cannot pursue a theory of aggravated murder by abuse of a dependent person, because, in defendant's view, the express reference to children "under 14 years of age" shows that the legislature intended to exclude homicides of children between the ages of 15 and 18 years of age qualifying as "dependent" based on age. Stated differently, defendant submits that the reference to "14 years of age" would be superfluous if "dependent person" was meant to include children dependent due to their age.

We reject defendant's argument. Under ORS 163.115(1)(c), a child "under 14 years of age" and a person who is dependent as a result of "either age or physical or mental disability" are not mutually exclusive categories. A victim who is dependent because of "age" is not limited to a child 14 years old or younger. Additionally, a person may be of any age and still qualify as a "dependent person" as a result of a "physical or mental disability." Thus, the statute does not exclude from its purview crimes of murder by abuse of children between the ages of 15 and 18 years of age.

## III.   CONCLUSION

We conclude that the trial court erred in denying defendant's motion to suppress with respect to certain statements made by defendant to investigators after she invoked her right to remain silent. However, we also conclude that the admission of those statements during the penalty phase constituted harmless error. We affirm the trial court's rulings in all other respects. Accordingly, we affirm defendant's conviction and her death sentence.

The judgment of conviction and sentence of death are affirmed.